935 So.2d 797 (2006)
STATE of Louisiana, Appellee
v.
Jywone Latress SMITH, Appellant.
No. 41,048-KA.
Court of Appeal of Louisiana, Second Circuit.
June 30, 2006.
*799 John Cucci, Jr., Shreveport, for Appellant.
J. Schuyler Marvin, District Attorney, John M. Lawrence, Melissa Sugar, Assistant District Attorneys, for Appellee.
Before BROWN, GASKINS, and LOLLEY, JJ.
BROWN, Chief Judge.
Defendant, Jywone Latress Smith, was convicted by a jury of the second degree murder of her husband, Billy Ray Smith, and sentenced to life imprisonment at hard labor without benefit. Defendant has appealed *800 her conviction. Finding no error, we affirm defendant's conviction and sentence.

Facts
Between the hours of 6:00 and 7:00 a.m. on October 28, 2002, defendant, Jywone Latress Smith, stabbed her husband, Billy Ray Smith, while he was seated on the couch in their apartment living room. Yvonne Woods, a neighbor, overheard defendant screaming at Billy around 6:30 a.m., "Get out of my house, . . . get the f____out of my house," which is when Ms. Woods got her kids up to get ready for school. Ms. Woods testified that a few minutes later, defendant's two sons ran to the Woods home and told her that "Mamma stabbed my daddy," before showing her what size knife she used. Ms. Woods related that the children told her that their parents had not been fighting prior to the stabbing, that "Daddy didn't do anything, mama just stabbed him."
Several neighbors, including Jamilla Edmonds who has a son by defendant's brother, went to defendant's apartment upon hearing screaming and yelling early that morning. Ms. Edmonds testified that she was the first person to go into the Smiths' apartment to help. She had heard defendant screaming and overheard her tell someone on the telephone that "you better come get your mother fucker son before I kill his ass." As she stood outside, defendant's two young sons came running out of their apartment yelling, "Help, help, mama stabbed him." Defendant came outside and saw Ms. Edmonds and asked for help, and that's when she went inside the Smith home. Defendant got on the floor between Billy's legs with her hand against the cut on his neck. Ms. Edmonds saw two long-handled knives on the floor by defendant. There was blood all over Billy's shirt and on the back of the couch. Ms. Edmonds stated that she picked up the knives and put them on the counter. She then called 9-1-1 at defendant's request, although defendant took the phone away from her and disconnected the call seconds later. Ms. Edmonds testified that when the phone rang subsequently, defendant instructed her not to answer it. Ms. Edmonds stayed in the apartment about 30 minutes and Billy was still breathing, although defendant told her he was already dead. Defendant wouldn't let anyone help and she refused to get off the victim.
Janis Clark, another neighbor, testified that she was one of the neighbors who called Ms. Hall about the yelling she heard coming from the Smith apartment. Ms. Clark heard a female, not a male, voice screaming. Ms. Clark found money wadded up and thrown in the doorway of defendant's apartment. She put this money in the drawer when defendant told her to do so. Several of the neighbors testified that defendant refused to move her hand from Billy's wound when they offered assistance in applying pressure.
Linda Boult testified that she heard someone screaming and going on when she woke up that morning. Ms. Boult stated that she always wakes up around 5:30 a.m. to get her nine children up and ready for school. She could still hear screaming an hour later, so she went to defendant's apartment to see if she could help. Ms. Boult told defendant she was a CPR instructor and asked if she could help. Defendant wouldn't move because she was afraid Billy would bleed more. Defendant told Ms. Boult that she and her husband had been fighting and that she had stabbed him. Defendant told her not to call 9-1-1 because she had already called them three times. Five minutes later, when the police arrived, Ms. Boult left. She testified that had defendant let her help, she feels certain they could have *801 slowed down the blood flow from Billy's wound.
Ernestine Hall testified that she is the property manager for Chateau Apartments and another property in Shreveport. Ms. Hall stated that she lives in apartment 605, which is in the same building as defendant's apartment. Around 6:30 or 6:45 a.m. on October 28, 2002, someone called in with a noise complaint about defendant's apartment. Ms. Hall testified that she walked downstairs and found the door open, so she went inside. She saw Billy sitting on the couch with his head back. Defendant was on her knees in front of Billy and defendant told her, "Ms. Hall, I didn't mean to do it. He and I got into it." The telephone kept ringing but no one answered it. Ms. Hall asked about the children and started walking down the hall to get the baby. She answered the telephone and a young man asked her whether his brother was all right. Ms. Hall told the caller to get over to the apartment right away because at that time, she didn't know what had happened or whether Billy was dead or alive. She was still in the apartment, having found the baby in the third bedroom, when the police got there. They got everybody out of the apartment because it was a crime scene. The police later brought her the baby and she took her to Ms. Woods' apartment, where the other children were.
Darla McDonald, a dispatcher with the Bossier Parish 9-1-1 service, stated that on October 28, 2002, she received a "hang up call" at 6:40 or 6:45 a.m. Ms. McDonald stated that she dialed the calling number but got a busy signal. Ms. McDonald then received another call from the same number; the caller related, "I stabbed him, I stabbed my husband." Other calls came through requesting assistance at the calling address and Ms. McDonald forwarded the information to the Bossier City Police Department.
Bossier City Police Department Patrol Officer Michael Williams testified that he responded to the call almost immediately, as he was in the area, and defendant told him that she "didn't mean to" stab her husband, "don't let him die." Officer Williams stated that defendant explained that the two had been fighting, and that "the knife that she had fell into his neck during the fight." Officer Williams, however, observed that nothing had been disturbed in the apartment and there were no signs that a struggle had occurred.
The victim was transported to LSU Health Sciences Center and Dr. Lou Smith, a general surgeon, testified that Billy survived surgery, but died while still in the operating room. Dr. Smith stated that any delay in calling 9-1-1 or "getting to medical care" would have reduced the victim's chance of survival. Dr. Cameron Francis Snider, a forensic pathologist, testified that he conducted the autopsy and concluded that the victim died from a single stab wound to the shoulder and neck. He stated that the stab wound was approximately four inches deep and that considerable force would have been necessary to inflict the wound. Dr. Snider testified that a "falling knife" could not have caused the injury and that both the victim and the defendant would have been aware that the stabbing had occurred. It was Dr. Snider's opinion that the stabbing was not accidental. Dr. Snider testified that defendant had defensive wounds on his calves. According to Dr. Snider, there were no traces of alcohol in the victim's liver, but traces of cocaine present indicated that the victim had ingested the drug "earlier in the day, hours before" death. Dr. Snider testified that applying simple pressure to the wound would not have *802 stopped the bleeding because the conjunction of two arteries was severed.
Detective Daryl Worley testified that he read defendant her Miranda rights which she waived prior to any statements. Detective Worley also stated that defendant signed a written waiver. Detective Jeff Cole testified that when he arrived at the scene, Billy Smith had already been transported to the hospital. He left Sergeant Smith processing the crime scene and went back to the police department to interview defendant. At that time, defendant stated that the victim "had been out all night" and had just arrived home around 6:00 a.m. When Billy came in the door, they began arguing. Defendant told Detective Cole that she armed herself with a knife and called Billy's mother to come and pick him up. Defendant stated that Billy was mad because she had disrespected his mother by cursing at her on the phone and he grabbed her by the throat while he was sitting on the couch. The two struggled and she did not realize that she had stabbed him. Defendant related that it "just looked like a little biddy (sic) cut" but all of a sudden it began to bleed. Detective Cole testified that defendant told officers at one point it had been an accident at another point that the "knife just fell out of her hand and fell in and cut him." Defendant told Detective Cole that it had not been self-defense and that she "knows all about self-defense" because she had shot a boyfriend before and that had been ruled a justifiable shooting, done in self-defense. Detective Cole learned that the victim had passed away and he and Captain Lott, who is also a pastor, notified defendant. Although defendant sobbed and yelled, she never cried any tears. Defendant then told the officers that she did not remember stabbing the victim and that she did not stab him. Detective Cole stated that while she was saying that she did not stab Billy Smith, defendant made repeated stabbing motions with her hand. Defendant reasoned that the wound could have been inflicted when the victim grabbed her. Detective Cole stated that there were four different stories told by defendant about the event.
At trial, there was testimony that officers on the scene had to restrain the victim's brother, Patrick Smith. The victim's mother, Patricia Smith, had sent Patrick to his brother's apartment because defendant had called Mrs. Williams before Billy had gotten home that morning relating that he had stayed out all night and threatening to stab him in "his goddamned face" when he got to the couple's apartment. Mrs. Williams testified that she sent Patrick to his brother's house because she "felt like something was going to happen."
Patrick Smith testified that his mother woke him up the morning of October 28, 2002, and told him he had to get to Bossier quickly because she had just got a phone call in which "this girl" [defendant] was talking about stabbing Billy and his mother wanted him to go pick up his brother. Patrick stated that he got dressed in a hurry, got his keys, cell phone, and wallet, and drove off in his car.
According to Mrs. Williams, after Patrick left, she called defendant and asked whether Billy had made it home. Upon learning that he was home, Mrs. Williams asked to speak to her son and when he came to the phone, she told him about defendant's prior phone call and threat to stab him. Mrs. Williams urged her son to get out of the house and told him that Patrick was on his way to get him. Mrs. Williams could hear Billy asking defendant, "Why you doing me like this?" as he agreed to leave the apartment and wait for his brother.
Patrick testified that he made several phone calls to Billy's house before he finally *803 got an answer. Some unidentified female told him he needed to get over there immediately. Patrick stated that he drove as fast as he could and when he got to Billy's, he was restrained by the officers. He was placed in the back of a police car and one of the officers told him that his brother had been stabbed, but was fine at that time. The officer called his mother and Patrick gave a statement to the officer and "that was pretty much it." The officers let him out of the car and he and his mother went to the hospital.
Defendant testified that Billy arrived home the morning of October 28, 2002, after she called his mother once. Defendant asked Billy to give back the money she had given him to pay bills and when he gave it to her, she threw it back at him because it was in smaller bills than she had given him. Defendant called Billy's mother a second time and this made him angry. Defendant told Mrs. Williams to "come over and get him because if he put his hands on her" she was "going to cut him with that knife." According to defendant, the victim was cut while they were "wrestling."
Defendant and Billy Smith were married less than a year. As part of her defense, several witnesses testified that the relationship had been abusive. Bernadette Tucker, who worked with both defendant and Billy at the Hollywood Casino, stated that she had seen defendant come to work with scratches or bruises on her neck and back and on several occasions Billy had arrived smelling of alcohol. Ms. Tucker testified that she thought that Billy was abusive, controlling, and possessive of defendant. Ms. Tucker related that it made Billy angry when she and defendant went out to a club, so they didn't go places together outside of work.
Tiki Lashoan Wilson, another coworker, testified that the victim had drinking problems and was abusive to defendant. Ms. Wilson stated that Billy once threatened to put out a cigarette in his pregnant wife's eye at her own baby shower. Ms. Wilson also testified that she had seen bruises and scratches on defendant's face and arms and heard Billy verbally abuse defendant while on the phone with her.
LaShawn Marshall, another coworker, testified that she witnessed Billy abusing defendant at work, including slapping her face with a handful of shaving cream, pushing her down on a bed in one of the guest rooms, and attempting to push a laundry cart into her. Ms. Marshall also stated that she picked defendant up one day after she and Billy were first married. Defendant ran to Ms. Marshall's car and told her they had to leave because Billy had a gun.
Defendant testified that the abuse started after their wedding, including a threat to shoot at a car she was riding in as she left to go to a party on New Year's Eve, an incident in which Billy pushed defendant "into the shower," an occasion when he slapped her with shaving cream while they were arguing at work, several fights in which he choked and punched her, one occasion when he tied her hands up and tried to drown her in the bathtub, and once when he threatened to "target practice" with her while holding a gun. Defendant stated that he also threw bleach on her once. She noted that Billy's mother and brother Patrick came over several times to calm down Billy and protect her. The police were called twice because of the abuse, and Billy was arrested once and charged with simple battery. According to defendant, on several occasions Billy told her and his mother that he would kill defendant if she ever left him.
Defendant's aunt, Lalisa Francis, testified that while helping clean up the apartment after the shooting, she found a gun *804 and a box of bullets beneath the couch that Billy had been sitting on. Ms. Francis stated that defendant had told her that she did not know the gun was there at the time of the stabbing.
Kenny Russell, defendant's former boyfriend, testified about being shot in the back by defendant on June 11, 2001. While no charges were filed against defendant, Russell was charged with aggravated battery for the altercation in which he had a "mop stick;" this fight occurred just prior to the shooting. Russell noted, however, that the charges against him were dropped.
The jury's verdict was unanimous and defendant was convicted of second degree murder. Thereafter, she was sentenced to life imprisonment at hard labor without benefit. She has appealed her conviction.

Discussion
According to defendant, the state failed to prove each element of second degree murder and to show that the killing was not done in self-defense in light of "a mass of credible evidence" that the victim had abused and threatened her in the past.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Ellis, 28,282 (La.App. 2d Cir.06/26/96), 677 So.2d 617, writ denied, 96-1991 (La.02/21/97), 688 So.2d 521. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La.1983); State v. Murray, 36,137 (La. App. 2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La.09/05/03), 852 So.2d 1020. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982).
Under La. R.S. 14:20(1), a homicide is justifiable when committed in self-defense by one who reasonably believes she is in imminent danger of being killed or receiving great bodily harm and that the homicide is necessary to save herself from danger. When self-defense is raised as an issues by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. D.P.B., 02-1742 (La.05/20/03), 846 So.2d 753; State v. Gaddis, 36,661 (La.App. 2d Cir.03/14/03), 839 So.2d 1258, writ denied, 03-1275 (La.05/14/04), 872 So.2d 519, cert. denied, 544 U.S. 926, 125 S.Ct. 1649, 161 L.Ed.2d 487 (2005). When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985).
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one of the weight, not the sufficiency, of the evidence. State v. Allen, 36,180 (La. App. 2d Cir.09/18/02), 828 So.2d 622, writs denied, 02-2595 (La.03/28/03), 840 So.2d 566, 02-2997 (La.06/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
The state proved that the victim died of a four inch deep stab wound to the shoulder and neck. Dr. Snider, the forensic pathologist who conducted the autopsy *805 testified that considerable force would have been necessary to inflict the fatal wound. Dr. Smith, the coroner, testified that the wound could not have been caused by a falling knife. A neighbor testified that defendant's young sons ran screaming from their apartment and told her that, "Mamma stabbed my daddy." The children also related that their parents had not been fighting. The 9-1-1 operator testified that during a call from the apartment, a woman stated that she had stabbed a man. Billy Smith's mother testified that defendant had called her early on the morning of October 28, 2002, and threatened to stab Billy in his "goddamned face."
Several witnesses testified that there were no signs of struggle in the apartment nor were there visible signs of abuse to support defendant's claim of self defense. Through her own testimony, defendant tried to show that she armed herself in self defense, but that the stabbing was accidental. This theory was weakened by defendant's statement to the police that she had not acted in self defense. She explained to the officer that she understood the concept of self defense because in the past she had not been charged or prosecuted after she shot a former boyfriend in the back.
Viewing the evidence presented in the light most favorable to the prosecution, a rational trier of fact could have found that the state proved the elements of second degree murder and that homicide was not committed in self defense beyond a reasonable doubt. This assignment of error is without merit.

Other Crimes Evidence
According to defendant, the trial court erred in allowing the state to present evidence that she had shot a former boyfriend after he had burglarized her home. Defendant claims that the state failed to "establish the reliability" of the prior act and failed to show that evidence of this prior act was used to prove "system or intent." It is defendant's position that the only function of this evidence was to show bad character.
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that the prosecution provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B). For evidence of other crimes to be admissible, the state must prove with clear and convincing evidence that the other acts or crimes occurred and were committed by the defendant; demonstrate that the other acts satisfy one of the requirements of La. C.E. art. 404(B); and show that the probative value of the evidence outweighs its prejudicial effect. State v. Jackson, 625 So.2d 146 (La.1993).
A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Butler, 30,798 (La.App. 2d Cir.06/24/98), 714 So.2d 877, writ denied, 98-2217 (La.01/08/99), 734 So.2d 1222.
In the instant case, the state filed a notice of intent to offer evidence of other crimes and offenses regarding two of defendant's former paramours, Kenny Russell and Leon Lewis. A hearing was held on April 19, 2004.
At that hearing, Shreveport Police Officer Paul Robinson testified that defendant *806 shot Kenny Russell, a former boyfriend, in the back on June 11, 2001. Defendant told police officers that Russell kicked down her apartment door and beat her with a mop handle. Defendant related that she attempted to shoot him but could not release the gun's safety. She realized how to deactivate the safety after several attempts, pursued Russell as or after (specific time unknown) he left the apartment, and shot him in the back. Defendant told police that she had fired the shot to "scare" Russell, indicating that the actual wounding was accidental. Officer Robinson stated that he observed no bruises, cuts, or signs of battery upon defendant. Kenny Russell survived his wound and refused to cooperate in prosecuting defendant. He was arrested and charged in accordance with the Domestic Violence Act.
Detective Jeff Cole, also testified at this hearing. He interviewed defendant at the police station, and she stated that she did not stab Billy Ray Smith in self defense. Defendant told police that she knew what self defense was because of the prior incident involving Kenny Russell. Detective Cole also testified that he learned that defendant had stabbed the father of at least one of her children, a man named Leon Lewis. Detective Cole testified that Lewis, who was "well known" to local law enforcement agencies, refused to make a statement or cooperate, although he did admit that he had been stabbed.
On May 4, 2004, the trial court issued a written ruling on the admissibility of the other crimes evidence sought to be introduced by the state. The trial court found the "evidence concerning the Russell shooting to be relevant and admissible in the instant case," as it went to intent, knowledge, and absence of mistake or accident. However, the trial court ruled that any information about an incident in which defendant allegedly stabbed Leon Lewis was inadmissible because of lack of details. According to the court, allowing evidence of this second incident would simply be allowing the state to admit evidence of defendant's bad character.
Kenny Russell testified at defendant's trial. Russell stated that he had a previous romantic relationship with defendant. While he was living with her in an apartment, they got into an argument because he had stayed out late drinking with some friends. Russell related that he left the apartment, but came back to use the phone to get a ride. Defendant would not let him in the house so he kicked in the door or "bumped it" with his shoulder. Russell admitted that he threw a mop and cursed at her, but testified that defendant had the gun in her hand when he did so. As he was "going out the door" of the apartment he heard "a gun go off." Russell testified that defendant shot him in the back. Russell was charged with aggravated battery and defendant was not charged. During her testimony, defendant stated that Russell kicked in the door of the apartment and beat her with a "mop stick." According to defendant, she shot Russell while he was still in her apartment.
Contrary to defendant's assertion, there is very little evidence which would establish that Kenny Russell was shot after he had burglarized her home. Instead, the evidence showed that, at the time of their altercation, defendant and Russell were cohabitating. The trial court did not err in admitting evidence as to Kenny Russell while excluding the evidence concerning Leon Lewis. This evidence was probative to show intent, knowledge, and absence of mistake or accident. Both the stabbing of Billy Ray Smith and the shooting of Kenny Russell occurred while defendant was in a romantic relationship and living with her *807 victim. Both men were injured after returning from a night out drinking or partying with friends. Both men apparently argued with defendant and both were told to "get out." Police officers did not detect bruises or other signs of abuse on defendant after either incident although defendant reported that she had been assaulted on both occasions.
While evidence about defendant shooting her former boyfriend is highly prejudicial, it is also probative to show that she possessed the requisite intent and to show lack of mistake or accident as she told officers that the stabbing of Billy Smith was accidental. Defendant had also told officers that she had shot Russell to scare him. The fact patterns of both incidents and defendant's statements regarding both incidents are similar. Furthermore, the prior episode goes to defendant's prior knowledge of self defense in her explanation to the police. The trial court correctly found that this other crimes evidence was proved by clear and convincing evidence, came under one of the exceptions set forth in La. C.E. art. 404(B), and was more probative than prejudicial. This assignment of error is without merit.

Closing Arguments
In this assignment of error, defendant argues that the prosecutor's reference to battered women's syndrome in her closing arguments was an assertion that defendant should have "produced proof of a mental defect." According to defendant, the state's attorney's statement prejudiced her and resulted in a "violation of due process and the right to a fair trial."
The scope of closing arguments is limited to the evidence admitted, the lack of evidence, conclusions of fact drawn therefrom, and the law applicable to the case. La. C. Cr. P. art. 774. The trial court has wide discretion in confining the arguments to the scope of the evidence. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Martin, 539 So.2d 1235 (La.1989). A prosecutor has considerable latitude in making closing arguments. State v. Casey, supra; State v. Taylor, 93-2201 (La.02/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996); State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986).
The Louisiana Supreme Court has recognized that "much credit should be accorded to the good sense and fair-mindedness of jurors who have seen the evidence and heard the argument, and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence." State v. Mitchell, 94-2078 (La.05/21/96), 674 So.2d 250, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996). Before a verdict will be overturned on the basis of improper argument, this court must be thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. State v. Taylor, supra; State v. Byrne, supra.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841; State v. Baker, 28,152 (La.App. 2d Cir.05/08/96), 674 So.2d 1108, writ denied, 96-1909 (La.12/06/96), 684 So.2d 925.
During closing arguments, the prosecutor made the following comment:
She [defendant] talked about things that happened a year, maybe less, some things that happened almost a year before this occurred. I haven't heard any testimony that this is a battered woman (sic) syndrome case. I didn't hear any *808 experts come up here and testify about battered women (sic) syndrome. Even if ... those witnesses were telling the truth, even if Billy did slap her months before at the boat, even if, even if those witnesses were telling some truth, how does that show that she was in reasonable fear for her life on October 28th, the day that she took Billy's life?
In the instant case, the trial court was lenient in allowing defendant to present the testimony of witnesses, including that of defendant herself, regarding specific incidents of domestic abuse inflicted upon defendant by the victim, Billy Ray Smith. The prosecutor's closing argument was directed at the credibility of this testimony and even if true, its relevancy to the charged crime. This assignment of error is meritless.

Jury Charge
The court shall charge the jury after the presentation of all evidence and arguments. The court shall reduce its charge to writing if it is requested to do so by either a defendant or the state prior to the swearing of the first witness at the trial on the merits. The court's written charge shall be read to the jury. The court shall deliver a copy thereof to the defendant and to the state prior to reading it to the jury. La. C. Cr. P. art. 801(A). A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of the objection. The court shall give the party an opportunity to make the objection out of the presence of the jury. La. C. Cr. P. art. 801(C).
If the evidence does not reasonably support a verdict, a trial court may exclude an otherwise proper responsive verdict. State v. Wright, 36,635 (La.App. 2d Cir.03/07/03), 840 So.2d 1271. The failure to object to the improper jury charge regarding responsive verdicts results in a waiver of the error on appeal. La. C. Cr. P. arts. 801, 841; State v. Houston, 40,642 (La.App. 2d Cir.03/10/06), 925 So.2d 690; State v. Wallace, 602 So.2d 296 (La.App. 2d Cir.1992).
In the instant case, the jury was given instructions as to second degree murder, manslaughter, and self defense. Neither the prosecutor nor defense counsel had any objections concerning the jury charge before it was read.
Negligent homicide was added as a responsive verdict listed under La. C. Cr. P. art. 814(5) by an amendment approved in 2003. Amendments to responsive verdicts are procedural, and the list of responsive verdicts in effect at the time of trial, not the time of the offense, should be used. State v. Garner, 39,731 (La.App. 2d Cir.09/08/05), 913 So.2d 874, writ denied, 05-2567 (La.05/26/06), 930 So.2d 19; State v. Martin, 351 So.2d 92 (La.1977).
Negligent homicide is the killing of a human being by criminal negligence. La. R.S. 14:32. Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. La. R.S. 14:12.
Defendant alternatively asserted theories that the stabbing was accidental or in self defense. Neither of those theories directly supports the responsive verdict of negligent homicide. While the evidence could arguably support a theory that defendant acted negligently in approaching *809 the victim while she was armed with a knife, this is not the version of events presented by either side. Defendant did not request negligent homicide as a responsive verdict before the jury retired to deliberate and failed to object to any alleged improper jury instructions. The error, if any, was waived, and this assignment of error is without merit.

Conclusion
For the reasons set forth above, defendant's conviction and sentence are AFFIRMED.