965 So.2d 580 (2007)
STATE of Louisiana, Appellee
v.
Phillip BROWN, Appellant.
No. 42,054-KA.
Court of Appeal of Louisiana, Second Circuit.
August 29, 2007.
*582 W. Jarred Franklin, for Appellant.
Phillip Brown, pro se.
Paul Joseph Carmouche, District Attorney, Dale G. Cox, Assistant District Attorney, for Appellee.
Before GASKINS, DREW and LOLLEY, JJ.
DREW, J.
Phillip Brown was convicted as charged of two counts of second degree murder. He was sentenced to life imprisonment without benefits on each count, to be served concurrently. He appeals. We affirm in all respects.

FACTS
On October 10, 2002, two groups of young Shreveport men began arguing[1] at Woodlawn High School. Gang signs were exchanged. A couple of days later, Phillip Brown was in a group leaving a skating rink when Randy Wilson and others exchanged words with them. Wilson fired shots in their direction.[2]
Two days later, a fight broke out at Woodlawn as the school day ended. Donnie Morgan, a young man from the Hollywood area, was beaten and bruised. Assistant principal Jim Cowdin chased a group of men, including Brown, away from campus.
Marquell Chambers discharged a gun from a departing car driven by Floyd Whitaker, injuring the leg of Jonathan Guiden, a bystander from the Cedar Grove area. Whitaker drove the car to Hattie Perry Park, where the Hollywood group typically gathered. Those present at the park included Tony Taylor, Jermichael Lewis, Morgan, and Wilson.
A little later, some of the Cedar Grove group, including Brown, Courtney Beaner, Carlton Brooks, Aaron Wallpool and Jemarcus Monroe gathered outside Wallpool's Shreveport home, located at Wallace and West 76th Street. A group of young men from the Hollywood area, including Tony Taylor (the driver), Kevin Taylor (Tony's cousin), Morgan, and Lewis, drove past in a Lincoln automobile. According to Tony, Brown fired gunshots at the Lincoln and/or in the air. The Taylors related that their group later retaliated with a drive-by *583 shooting directed at the Wallpool group. Nobody was hurt.
Monroe testified that the Lincoln drove past once, with shots being fired at the Cedar Grove group. Monroe denied that anyone returned fire.
At about 5:00 p.m., members of the Cedar Grove group, including Brown, Beaner, Brooks, and Shamichael Tillman, drove to Hattie Perry Park, hoping to retaliate against Wilson. The attempt was thwarted because the police were at the park arresting Chambers for being the shooter in the Woodlawn drive-by.
LaDonna Austin lived at a Lexington Street home with her sister, LaDorothy Austin. LaDonna and LaDorothy witnessed Brown, Beaner, Shamichael Tillman, and Marlon Washington discussing the Woodlawn fight and making plans to retaliate against Wilson for the earlier Wallace/West 76th Street shooting. LaDorothy heard Brown say he was going to "shoot." She saw Brown and Beaner with guns. LaDonna and LaDorothy saw the group of men dress in black clothing with hoods and leave the Lexington Street home in a white Honda.
While LaDonna left for a quick trip to the grocery store, LaDorothy saw the men return and then leave again. Their first drive-by attempt had been deterred by police presence. Monroe went with the others. He said Brooks drove and Brown sat in the front passenger seat. Brown, Tillman, and Beaner all had guns.
At approximately 9:00 p.m., Ronnie Chambers went to pick up his 15-year-old sister, Chiquita Chambers, on the corner of Oakdale and Ledbetter, at a home where some of the Hollywood group hung out. When Ronnie arrived, there were several young men standing in the yard, including Wilson and Lewis. Ronnie parked his car on the street and his sister ran out of the house toward him. A white Honda Accord with a sunroof and tinted windows drove by on Ledbetter. Chiquita was standing in the street behind Ronnie's car when the white Honda pulled up within a few feet of her. Two guns emerged from the Honda's sunroof and fired several shots "point blank" at Chiquita, striking her in the chest. She was pronounced dead that night. Lewis died early the next morning. Wilson (the target) was shot in the arm. No witness to the shooting testified that the victims were armed.
Monroe witnessed all three men-Brown, Tillman and Beaner  shoot their guns as their car drove past the group of people standing on the corner.
The group of men returned in the Honda to the Lexington Street home about 15 minutes after they had departed, where they told LaDonna that they did a "drive-by" shooting on Ledbetter. LaDorothy saw Tillman drive off in the Honda. Brown admitted shooting from the sunroof, but didn't know if he hit anyone.
LaDorothy saw Beaner and Brown return home and heard Brown say that:
 he did not know that the girl was on the porch;
 the girl was at the wrong place at the wrong time;
 the rest "of them deserve what they got";
 they wanted to kill Wilson; and
 his (Brown's) gun jammed, so Beaner shot first, and then he (Brown) also fired.
The subsequent crime scene investigation yielded numerous .380 and .40 caliber shell casings. Police searched the Lexington Street home the next day and seized two firearms from LaDorothy's room  a Lorcin .380 caliber semiautomatic pistol and a Bryco .380 semiautomatic pistol with a red sight  plus magazines and live ammunition. *584 After interviewing Beaner, it was determined that he had been armed with the Bryco. The police never located a .40 caliber pistol during this investigation.
Bullet slugs were recovered from the bodies of Chiquita and Lewis during autopsies. Richard Beighley, a firearms expert with the North Louisiana Criminalistics Laboratory, concluded that:
 the slug recovered from Chiquita's body was fired from the Bryco .380, as were six of the fired .380 caliber cartridge casings recovered from the scene;
 five of the .380 caliber cartridge casings were fired from the .380 Lorcin; and
 the slug from Lewis's body was fired by a .40 caliber semiautomatic pistol.
The white Honda, which had been stolen the night before, was later recovered by police. It was burned almost beyond recognition.
The investigation led to the arrest of Brown, who related that:
 he had been the target of gunfire earlier in the day;
 he heard that the shooter was Wilson;
 "everybody" decided to "go shoot;"
 he was in the front passenger seat of the car and was armed with a .380 semiautomatic pistol;
 he shot his gun out of the sunroof as the car was going up the hill;
 after the shooting, he took his gun home; and
 Beaner later picked up the gun.
After a trial by jury, Brown was convicted as charged of two counts of second degree murder. He was sentenced to a term of life imprisonment without benefits on each count, to be served concurrently.

DISCUSSION
Sufficiency of Evidence
The defense argues that:
 the state failed to meet its burden of proving beyond a reasonable doubt that Brown killed the victims while committing a drive-by shooting;
 none of the bullets recovered from the victims was linked to a weapon possessed or fired by the defendant;
 Brown specifically told LaDonna that the shots were not meant for the girl; and
 the state failed to prove specific intent with regard to Chiquita's death.
In the alternative, it is argued that the homicides were justifiable because Wilson had shot at Brown and made death threats on previous occasions, so that Brown had to take action against Wilson to avoid being killed himself. This argument falls somewhere between depressing and offensive.
The state responds that there is no requirement of proof that Brown fired the fatal shots because he was proved to be a principal in both killings. Arguing that a reasonable jury could easily conclude that Brown did not act in self-defense, the state notes that:
 there was a long gap in time between the earlier afternoon attacks by Wilson and the retaliatory drive-by at 9:00 p.m. that resulted in the double homicide, during which time the defendant's temper should have cooled; and
 after the homicide Brown did not appear to be scared and it was clear that the shootings were acts of revenge, not rage.
Although the record does not reflect that defendant filed a motion for post verdict judgment of acquittal pursuant to La. C. Cr. P. art. 821, this court will consider sufficiency arguments in the absence *585 of such a motion. State v. Henson, 38,820 (La.App.2d Cir.9/22/04), 882 So.2d 670. Our law on review for sufficiency of evidence is well settled.[3]
Second degree murder, in relevant part, is the killing of a human being (1) when the offender has a specific intent to kill or to inflict great bodily harm; or (2) when the offender is engaged in the "perpetration or attempted perpetration of . . . [a] drive-by shooting . . ., even though he has no intent to kill or inflict great bodily harm." La. R.S. 14:30.1. A "drive-by shooting" means the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person. La. R.S. 14:37.1.
Regarding principals, La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. See State v. Robinson, XXXX-XXXX (La.4/14/04), 874 So.2d 66. It is of no consequence whether a defendant, in firing his weapon into a group of people, intended to hit one person or several people. See State v. Tyler, 342 So.2d 574 (La.1977), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227.
The state bears the burden of proving beyond a reasonable doubt that the homicide was feloniously committed and was not perpetrated in self-defense. State v. Patterson, 295 So.2d 792 (La.1974).
In State v. Smith, 41,048, p. 11 (La. App.2d Cir.6/30/06), 935 So.2d 797, 804, this court held:
Under La. R.S. 14:20(1), a homicide is justifiable when committed in self-defense by one who reasonably believes she is in imminent danger of being killed or receiving great bodily harm and that the homicide is necessary to save herself from danger. When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense.
Citations omitted.
A thorough review of the record reflects that the evidence is sufficient to support the defendant's convictions of second degree murder under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 *586 (1979). Viewed in the light most favorable to the prosecution, the evidence was sufficient for a reasonable trier of fact to conclude that Brown was a principal in a retaliatory, drive-by shooting that resulted in the death of the two victims. The defendant's specific intent to kill or at least inflict great bodily harm may be inferred from his act of pointing a gun and firing at the group of people. It is of no consequence whether defendant, in firing his weapon into a crowd, intended to hit one person or several people. Moreover, Brown clearly and actively participated in an assault by drive-by shooting, leading to two deaths, which satisfies the elements of felony second degree murder, even if specific intent to kill or inflict great bodily harm had been unproven. Finally, the record further supports the conclusion that the state proved that the drive-by homicides were not perpetrated in self-defense, but were feloniously committed.
Other Crimes Evidence
Defendant argues that the trial court erred in admitting evidence of other crimes. The law on the evidence of other crimes is well settled.[4]
The state filed a pretrial motion to allow the admission of La. C.E. art. 404(B) other crimes evidence during the trials of several defendants, including Brown. The evidence, offered to prove motive, intent, preparation and plan for the double homicide, is summarized as follows:
 Evidence of a verbal altercation and the exchanging of gang signs between men associated with the Hollywood area and the Cedar Grove area during a Woodlawn pep rally.
 Evidence of a fistfight on the Woodlawn campus on the afternoon of October 14, 2002, involving Beaner, Brooks (both associated with the group from the Cedar Grove area) and Morgan (who was associated with the group from the Hollywood area).
 Evidence of a shooting near Woodlawn in which Guiden was shot in the leg. Chambers did the shooting while Whitaker drove.
 Evidence of a shooting at West 76th Street and Wallace Street involving a group of men near the home of Wallpool and a group of men firing shots from a Lincoln automobile.
 Evidence of the presence of a group from Hollywood and a group from Cedar Grove at Hattie Perry Park on the afternoon of October 14, 2002, and the fact that the Cedar Grove group's attempt to "settle the score" was thwarted by police presence.

*587  A white Honda automobile owned by Edrina Smith was stolen on October 13, 2002, and used in the homicides the next day.
 The Cedar Grove group burned the white Honda on the night of October 14, 2002, after using it to perpetrate the double homicide.
 Brooks, Beaner, Tillman and Brown were in a Cedar Grove gang; Morgan, Lewis, and the Taylors were members of a Hollywood gang.
At the Prieur hearing, the state's witnesses were cross-examined. During the cross of Det. Hinderberger, Brown's attorney asked questions about threats on the defendant's life. The state objected that such cross-examination was beyond the scope of cross-examination and irrelevant. The trial court overruled the objection, commenting that it seemed implicit in the direction of the defense questioning that the defense was not going to object to the testimony. Defense counsel continued to question Det. Hinderberger regarding events that preceded the double homicide.
The state called Det. Cromer, who was cross-examined. Brown's attorney then objected to the admission of the evidence listed in the motion, including:
 any reference to the defendant's gang affiliation;
 that Whitaker and Marquell were the subjects of attack as opposed to the attackers (during the shooting at Woodlawn); and
 any evidence purporting to connect Brown with ongoing criminal activity.
Brown's counsel also made a general objection that the state lay the proper foundations at trial before the introduction of any evidence under La. C.E. art. 404(B).
The trial court found the listed evidence admissible in accordance with La. C.E. art. 404(B) because it tended to prove motive, opportunity, intent, preparation, plan, knowledge, and identity and, further, could be said to constitute an integral part of the alleged double homicide. The court allowed evidence of gang association at trial.
The defense now argues on appeal that:
 the state failed to show that Brown was involved in the crimes listed in the La. C.E. art. 404(B) motion;
 the testimony was in conflict as to whether Brown fired shots at the Lincoln while in front of the Wallace/West 76th Street home;
 the only connection between any of these crimes and Brown was LaDorothy's testimony that Brown drove by Hattie Perry Park and saw the police;
 the other crimes referenced by the state were sufficiently removed in time from the charged offenses to have no probative value for motive, intent or system; and
 the state offered this great volume of other crimes evidence merely to prove the alleged bad character of the defendant, substantially violating his rights.
The state counters that:
 the defense failed to object to the introduction of the other crimes evidence and thereby waived the right to contest the evidence on appeal;
 the evidence was admissible to prove motive and intent for this retaliation shooting and purported justification of self-defense;
 because Brown was the intended victim of the earlier shooting and had been involved in the fight at Woodlawn, he had a motive to retaliate against Wilson;
 Brown had been a victim of a shooting by Wilson the week before; and

*588  the trial court was correct in determining that the events of October 14, 2002, were close enough in time and space to constitute one continuing transaction.
This court observed in State v. Barnes, 28,835 (La.App.2d Cir.12/11/96), 685 So.2d 1148, that members of gangs are not regarded as model citizens, and there is an inherent connotation that a gang member is involved in criminal activity, which could create an image of a bad person in the eyes of the jury. This court concluded that the evidence of the defendant's gang affiliation was prejudicial because the evidence was not relevant to any of the elements of the armed robbery. However, this court deemed the error to be harmless because there was direct evidence that placed the defendant in possession of items identified with the armed robbery. Thus, the gang evidence did not contribute to the guilty verdict.
In State v. Williams, 02-645 (La.App. 5th Cir.11/26/02), 833 So.2d 497, writ denied, XXXX-XXXX (La.4/25/03), 842 So.2d 398, the court found that the defendant's gang affiliation had independent relevance in establishing the defendant's motive and intent for second degree murder.
In State v. Weatherspoon, 06-539 (La. App. 5th Cir.12/12/06), 948 So.2d 215, the defendant was charged with the first type of second-degree murder, making specific intent an issue. The court noted that the state's theory was that the shooting was a result of gang members seeking revenge for an earlier altercation and hence, the gang-related revenge evidence was relevant to show defendant's motive of specific intent to injure. The court found that the admission of such evidence was not improper.
The trial court properly found this other crimes evidence admissible under La. C.E. art. 404(B). The state proved with clear and convincing evidence the defendant's gang affiliation and his participation in the various gang-related altercations, shootings and other criminal activities surrounding the instant offenses. The state also proved that the evidence came under one of the exceptions set forth in La. C.E. art. 404(B). The fact of gang affiliation was relevant to show his motive to specifically injure the intended victim, who was affiliated with a rival gang. The record further supports the trial court's finding that the evidence relates to conduct that constitutes an integral part of the alleged double murder. Finally, a review of the record supports the conclusion that the state showed that the evidence was more probative than prejudicial.
The Confession
The defendant was implicated as one of the shooters during the course of the investigation conducted by the Shreveport Police Department. He was arrested for first degree murder on October 17, 2002, and orally advised of his Miranda rights. Brown submitted to a recorded interview by Det. Hinderberger. The statement began after Brown was advised that he was under arrest for first degree murder. Det. Cromer and Det. Hinderberger were present during alternating portions of the defendant's interrogation. Det. Hinderberger ascertained the defendant's age (19), grade in high school (12th), and the fact that he could read and write the English language. Brown was advised of his Miranda rights, which were read from a standardized Miranda waiver of rights form. Brown told Det. Hinderberger that he did not understand the reason for the "under arrest part," categorically denied being involved in the shooting, and told a story about walking home from school and then riding a bike to his grandmother's house. After the detective explained that he and the individuals who *589 had implicated him were all under arrest for first degree murder, punishable by death or life imprisonment, Brown acknowledged that he understood his rights and signed the Miranda waiver of rights form. He agreed to give an epithelial cell sample, taken by Det. Cromer. Det. Hinderberger then asked Det. Cromer to "sit in" on the interview. Det. Cromer told Brown that he needed to think about cooperating because it makes a difference down the road, to be a man and to do the right thing. Cromer also told Brown that it was "fine" if they only intended to scare the victims and this was a big accident. Det. Cromer denied making any promises to Brown.
According to all three detectives, Brown understood all questions, gave appropriate answers, did not appear to be under the influence of alcohol or drugs and never requested any food, water or rest. Also, all three detectives testified that they did not strike Brown, or make any threats or any promises to him in exchange for his statement. Brown admitted his participation in the shooting.
The defendant argues that his Miranda waiver was ineffective because it was made under undue influence and coercion. In support of his argument, Brown notes that:
 at the time he didn't understand the "under arrest" part of his detention;
 he was a high school student;
 the detective's office, with three detectives in it, was small;
 there was a lack of ascertainment as to his literacy;[5]
 nobody was present besides Det. Hinderberger during the advisement of rights;
 during the interview, Det. Hinderberger told Brown that he did not believe him and discussed the penalty for first degree murder but not responsive verdicts;
 Det. Cromer's advice to Brown was that it was "fine" if they only intended to scare the victims and this was a big accident; and
 the detectives tried to frighten and coerce him into giving a statement, making it involuntary and therefore inadmissible.
The state responds that:
 there is no prohibition against more than one law enforcement officer being present during a custodial interrogation;
 the penalty for the charged crime may be discussed;
 there is no rule that responsive verdicts be discussed during a statement;
 much of Brown's statement was an attempt to deceive Det. Hinderberger;
 none of the detectives ever threatened him, nor did any of them offer any inducements to make his statement; and
 the defendant's statement was freely and voluntarily given.
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La. App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288.
The law regarding the admissibility of confessions was set out in great detail in State v. Bowers, 39,970, pp. 10-12 (La. App.2d Cir.8/19/05), 909 So.2d 1038, 1046-7:

*590 Before a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Roddy, supra; State v. Walker, 28,577 (La. App.2d Cir.10/4/96), 681 So.2d 1023.
In State v. Jackson, 381 So.2d 485 (La.1980), and State v. Morvant, 384 So.2d 765 (La.1980), the Louisiana Supreme Court stated the principles under which the admissibility of a confession must be judged. As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. State v. Roddy, supra.

In Louisiana, the statutorily mandated test for voluntariness is not whether a confession was induced by improper external forces, but whether the confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; State v. Roddy, supra.

The admissibility of a confession is a question for the trial court. State v. Roddy, supra. When determining admissibility, the trial court's conclusions on the credibility and weight of the testimony with regard to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Roddy, supra; State v. Dailey, 607 So.2d 904 (La.App. 2d Cir.1992), citing State v. Jackson, supra. We place great weight upon the trial court's factual determinations because of its opportunity to observe the witnesses and assess credibility. State v. Roddy, supra; State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082. Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Henderson, 31,986 (La.App.2d Cir.8/18/99), 740 So.2d 240. See State v. Trotter, 37,325 (La.App.2d Cir.8/22/03), 852 So.2d 1247, writ denied, 2003-2764 (La.2/13/04), 867 So.2d 689.
When the defendant alleges police misconduct in eliciting a confession, it is incumbent upon the state to specifically rebut each instance of alleged misconduct. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363; State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359; State v. Walker, 28,577 (La.App.2d Cir.10/4/96), 681 So.2d 1023.
Courts have routinely held that a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," will not negate the voluntary nature of a confession. State v. Blank, XXXX-XXXX (La.4/11/07), 955 So.2d 90.
Illiteracy, like low intelligence and moderate mental retardation, does not by itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. See State v. Brown, 414 So.2d 689 (La.1982). The main question is whether the defendant understands his rights. Id.
In State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244, the defendant's *591 confession was determined to be freely and voluntarily given although the officers stated during custodial interrogation that the defendant needed to be honest if he hoped to have any chance of spending time with his son outside of prison, and that if defendant went to trial, he faced the death penalty. This court agreed with the trial court that the statements regarding defendant's son and the death penalty were mere musings and not beyond what the defendant could have concluded on his own. It was further noted that the defendant was advised of his Miranda rights and waived them.
The state affirmatively proved that the defendant's confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Brown was advised of and waived his Miranda rights. His rights were explained, not just read to him. The trial court had ample evidence to conclude that Brown understood his rights and voluntarily waived them. Nothing here supports the defendant's claims of coercion. Mild exhortation to tell the truth does not negate the voluntary nature of a confession.
Excessiveness of Sentence
The defense takes the position that even though life sentences are mandatory for second degree murder, they are nonetheless unconstitutionally excessive because they serve no purpose other than the needless imposition of suffering. The state notes that there was no basis on which the court could vary from these legislatively mandated sentences, given the serious nature of the offenses.
Second degree murder requires a harsh mandatory sentence, but this is a harsh crime. La. R.S. 14:30.1(B). The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789.
In State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, the supreme court addressed the issue of mandatory sentences in the context of the habitual offender law. The court held that the downward departure from a mandatory minimum sentence may occur if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. This rule has been extended to mandatory minimum sentences beyond habitual offender cases. See State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274; State v. Chandler, 41,063 (La.App.2d Cir.9/8/06), 939 So.2d 574, writ denied, 2006-2554 (La.5/11/07), 955 So.2d 1277.
The sentences imposed are neither illegal, grossly disproportionate to the severity of the offense, nor shocking to the sense of justice. There is nothing in this record to show Brown as an exceptional defendant or that there were unusual circumstances not considered in this case. Brown fired a gun during a drive-by, resulting in the deaths of two innocent bystanders. This conduct, personifying an appalling disregard for the sanctity of human life, amply justifies the two concurrent life sentences.

DECREE
The defendant's convictions and sentences are AFFIRMED.
NOTES
[1] One group from Hollywood Heights, and the other group from Cedar Grove.
[2] LaDorothy Austin testified to these facts at trial.
[3] The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
[4] Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that the prosecution provides reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B). For evidence of other crimes to be admissible, the state must prove with clear and convincing evidence that the other acts or crimes occurred and were committed by the defendant; demonstrate that the other acts satisfy one of the requirements of La. C.E. art. 404(B); and show that the probative value of the evidence outweighs its prejudicial effect. State v. Jackson, 625 So.2d 146 (La.1993); State v. Smith, 41,048 (La. App.2d Cir.6/30/06), 935 So.2d 797.

A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Smith, supra; State v. Butler, 30,798 (La.App. 2d Cir.06/24/98), 714 So.2d 877, writ denied, 98-2217 (La.01/08/99), 734 So.2d 1222.
[5] Brown printed his name on the waiver of rights form.