982 So.2d 353 (2008)
STATE of Louisiana, Appellee
v.
Jesse Tremel STEWART, Appellant.
No. 43,149-KA.
Court of Appeal of Louisiana, Second Circuit.
May 7, 2008.
*354 Carey J. Ellis, III, Louisiana Appellate Project, for Appellant.
Jesse Tremel Stewart, pro se.
Paul J. Carmouche, District Attorney, Lea Hall, Jr., Brady O'Callaghan, John Ford McWilliams, Jr., Assistant District Attorneys, for Appellee.
Before GASKINS, CARAWAY and PEATROSS, JJ.
CARAWAY, J.
Jesse Tremel Stewart was convicted of second degree murder and received the mandatory life sentence without benefit of parole, probation or suspension of sentence. In this out-of-time appeal, Stewart raises arguments relating to sufficiency of the evidence to convict and prosecutorial misconduct. Because we find no merit to Stewart's claims, we affirm his conviction and sentence.

Facts
In the early morning of August 29, 2003, Marcus Taylor, Joseph Kennedy, Anthony Miles and Stewart rode around the Shreveport area in a maroon Suburban rented in the name of Andrea Adams. Taylor testified that he had obtained custody of the Suburban when Robert Adams, Andrea's brother, instructed him to retrieve it from Andrea's house at 6226 Kelly Key Drive. Robert Adams dated Taylor's sister.
Marcus Taylor drove the Suburban in which Stewart rode as a passenger in the front seat. Kennedy sat behind Stewart and Miles was seated behind Taylor. As the four traveled east on East 70th Street in Shreveport, near the I-49 overpass, a blue Chevrolet Caprice occupied by Deandre Brokenberry, Quacy Francis and Mario Cawthorn pulled up beside the Suburban. The occupants of both vehicles were familiar with each other due to an ongoing feud which had previously involved guns and shooting. Taylor testified that it was Miles who yelled "he have a gun," and shots were fired first from the Caprice. Occupants of the Suburban returned fire. At trial Kennedy admitted to shooting a .233 Mini Fourteen Ruger rifle. Both Taylor and Kennedy testified that Stewart shot a .40 caliber Desert Eagle pistol which allegedly belonged to Robert Adams.
At some point during the altercation, the Caprice turned right onto Southern Avenue, followed by the Suburban. After a two-block chase down Southern Avenue with continued gunfire, the driver of the Caprice lost control and the vehicle wrecked, landing in trees and bushes off of East 72nd Street after striking a water hydrant, street sign and light pole. Audrey Robinson heard the commotion and observed the car wrecked at the end of his street. He also observed three or four men moving around and acting strangely. One of the men had been shot in the back. The men left heading east through the Robinson's yard. Robinson testified that *355 two of the men had guns which he described as a pistol and a rifle.
Johnny Ray O'Neal worked the midnight shift at General Motors. He returned to his house at 7209 Southern Avenue at around 6:00 a.m. and encountered a barricade at Southern Avenue. After detouring home, his wife told him about the shooting in the neighborhood earlier that morning. O'Neal immediately went to check on his elderly neighbors, Virgil and Lottie Myers. Virgil told O'Neal that he had heard shooting earlier and that he could not "get Lottie woke." O'Neal attempted to get a pulse from the motionless elderly woman who appeared to be asleep on her couch. When he could not, O'Neal summoned police who dispatched paramedics and declared the Myers home a crime scene. Lottie Myers died from a gunshot wound to the top of her head from an errant bullet that penetrated the wall of the home. Expert testimony established that the bullet which killed Myers was consistent with that fired from a .233 Mini Fourteen Ruger ("Ruger") rifle, although no positive identification of the weapon could be established.
A probation and parole officer identified the Caprice as a vehicle he knew to be driven by Quacy Francis. An undercover agent informed police about the ongoing feud between Francis and Adams and that Adams had recently rented a maroon Suburban. When an eyewitness to the shooting identified the maroon Suburban as part of the chase, police set up surveillance at Adams' sister's residence at 6226 Kelly Key. As police observed the residence, they saw a maroon Suburban drive up and park at the rear of the house out of view. Police obtained Andrea Adams' permission to search her home. Police found Stewart and Taylor inside of the home as well as a Ruger rifle on a table and a .40 caliber Desert Eagle pistol in a dresser drawer in a bedroom.
Taylor and Stewart were arrested at that time, and from a tip given by Miles to police, Joseph Kennedy was later apprehended. In a statement to police, Stewart acknowledged being in the Suburban. He was subsequently charged by amended indictment with the second degree murder of Lottie Myers. A unanimous jury convicted Stewart as charged. After the trial court denied a motion for reconsideration of the mandatory life sentence imposed upon Stewart, this appeal ensued.

Discussion
In his assignment of error filed by appellate counsel, Stewart argues that the state failed to present sufficient evidence to establish that the bullet that killed Myers came from a gun which he or any occupant of the Suburban was shooting.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La.C.Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson, standard is applicable in cases involving both direct and circumstantial *356 evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Montgomery, 42,835 (La.App.2d Cir.1/9/08), 974 So.2d 110. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
The crime of second degree murder is set forth in La. R.S. 14:30.1(A), which provides in pertinent part:
Second degree murder is the killing of a human being (1) when the offender has a specific intent to kill or to inflict great bodily harm; or (2) when the offender is engaged in the "perpetration or attempted perpetration of . . . [a] drive-by shooting . . ., even though he has no intent to kill or to inflict great bodily harm."
Louisiana utilizes an "agency" theory of liability which holds that the doctrine of felony murder does not extend to a killing, although growing out of the commission of the felony, if directly attributable to the act of one other than the defendant or those associated with him in the unlawful enterprise. State v. Myers, 99-1849 (La.4/11/00), 760 So.2d 310. In contrast, the "proximate cause" theory in felony murder cases holds a defendant liable for any death proximately resulting from the unlawful activity; this theory is often limited by the requirement that the death be a foreseeable consequence of the felony. Id.
A "drive-by shooting" is defined as the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person. La. R.S. 14:37.1; State v. Gipson, 28,113 (La.App.2d Cir.6/26/96), 677 So.2d 544, writ denied, 96-2303 (La.1/31/97), 687 So.2d 402.
The law of principals is set forth in La. R.S. 14:24 as follows:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. State v. Schwander, 345 So.2d 1173, 1174-1175 (La.1977). Whether a defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convicted as a principal to the crime. State v. Gilliam, supra.
In Audrey Robinson's testimony, he described hearing a loud noise as the car wrecked, followed by gunfire. He went outside to investigate and talked to the men who exited the Caprice. When he asked if they were alright, the group responded affirmatively and told Robinson some guys had been shooting at them. Robinson also recalled that two of the men were carrying weapons, one a handgun and the other a "rifle type" weapon.
As its first witness, the state called Shreveport Police Officer, Karl Hill, who responded to a shooting and wreck of the *357 vehicle. At the scene, Officer Hill observed the Caprice, with heavy front end damage, off the side of the roadway in trees and bushes at the corner of Southern Avenue and 72nd Street on the same side of the street as the victim's home. As Officer Hill approached the vehicle, he observed bullet holes on the side and rear area of the car. The officer was given the report by Audrey Robinson concerning the occupants of the Caprice who fled the scene.
Detective Lane Smith of the Shreveport Police Department testified regarding his involvement with the investigation of the shooting. As a part of his duties, Detective Smith located two witnesses at the Racetrack gas station and convenience store on the corner of 70th Street and Southern Avenue. One of the witnesses reported that his truck had been damaged by a bullet. Other unidentified witnesses informed Detective Smith that a maroon SUV was at the scene of the shooting.
Detective Smith testified that the group investigating the murder went to the 6226 Kelly Key address and set up surveillance of the residence. Ultimately, Andrea Adams provided written consent for a search of her home. Upon entry, Detective Smith found Stewart and Marcus Taylor pretending to be asleep on the couch. They were taken into custody. The home was searched, and a .223 Ruger was found in the living room and a .40 caliber Desert Eagle handgun was found in a bedroom.
Mr. Virgie "Red" Myers, the victim's husband, testified that on the day his wife died, he heard shots fired from what sounded like a small gun, followed by shots from a "big gun" at about 5:00 a.m. outside his home at 7205 Southern Avenue. Mr. Myers was able to get down on the floor but he believed his wife was too sick to move from the couch. Mr. Myers testified that his wife was very ill and had recently become unable to dress herself. Mr. Myers last spoke with his wife at approximately 3:00 a.m. Mr. Myers corroborated O'Neal's testimony regarding his visit with Myers on the morning of the shooting and the discovery of his wife's fatal wound.
Corporal Skyler Van Zandt, a crime scene investigator with the Shreveport Police Department, testified for the state. Corporal Van Zandt identified photographs which depicted the crime scene and the framed, wooden room where the victim died. The photographs showed the wrecked Caprice at the corner of East 72nd and Southern Avenue. Based on the location of the bullet hole in the house, and using dowel rods through the outside wall to the couch where the victim died, Corporal Van Zandt was able to estimate that the bullet that killed the victim was fired somewhere near the area of Southern Avenue northwest of the victim's house. According to Corporal Van Zandt, the bullet hole lined up with the top of the victim's head as she reclined on the couch.
Outside, Corporal Van Zandt found a Glock weapon inside of the Caprice. He noted extensive front-end damage as well as multiple (seven) bullet holes in the rear portion of the vehicle. Corporal Van Zandt testified that he utilized dowel rods to demonstrate the path of the bullets that entered the rear of the vehicle. He testified that the damage to the rear portion of the vehicle was consistent with bullets being fired into the Caprice from a trailing vehicle, rather than from inside the Caprice.
Corporal Van Zandt testified that the crime scene extended over 500 feet, approximately two blocks, including the 7100 and 7200 blocks of Southern Avenue. Ten shell casings were discovered within the crime scene. Eight of the shell casings were from a rifle and the other two from a .40 caliber weapon. The casings were consistent *358 with the weapons that were later recovered at Andrea Adams' home. Corporal Van Zandt admitted that there were other weapons that would fire the same type of ammunition. While his memory was not definitive, Corporal Van Zandt recalled that the spent .40 caliber casings found at the crime scene matched the head stamps on the .40 caliber rounds later found at Andrea Adams' home. Based on the location of the casings along the street, Corporal Van Zandt speculated that the shooters were likely moving as the shots were fired. This theory was confirmed by other casings that were found scattered throughout the crime scene. Six additional .223 caliber spent shell casings were discovered further away from the location of the first shells located within the crime scene.
In the driveway of Audrey Robinson's home, within the crime scene, a live 9mm cartridge was discovered near a red substance that was believed to be blood. Four 9mm spent casings and a bullet fragment were discovered inside of the Caprice. Corporal Van Zandt testified that there was no evidence collected to suggest that there were any other weapons involved in the shooting, and there was no way to identify any other weapons that were on the scene.
Within the crime scene, a vehicle other than the Caprice was discovered to have sustained damage from a bullet projectile. Corporal Van Zandt found and collected a piece of an automobile antenna that was in the roadway. Further investigation revealed that the portion discovered at the crime scene appeared to be the piece missing from the antenna of maroon Suburban.
Corporal Van Zandt used the information collected from the crime scene to generate computer diagrams of the crime scene that were introduced into evidence. The diagrams depicted the location of the Caprice which wrecked at the corner of 72nd Street and Southern Avenue immediately northwest of the Myers' home.
Shuricka Taylor, the girlfriend of Robert Adams and sister of Marcus Taylor, testified for the state. She testified that Adams, her brother, Stewart and Joseph Kennedy were good friends who used the rented Suburban. On the night of the shooting, Robert Adams was at home with Shuricka Taylor. She believed her brother called the residence that night requesting to use the vehicle. Shuricka Taylor was aware of troubles between Robert Adams, her brother and their friends and the other group of men. Shuricka Taylor testified that she was involved in several incidents with members of the rival group. She knew the two groups did not get along, but was unaware of the specific source of the contention. Shuricka Taylor heard that there had been exchanges of gunfire between the two groups.
Co-defendant Marcus Taylor testified as a witness for the state and admitted to pleading guilty to manslaughter for his involvement in Myers' death. Taylor testified he was with Stewart, Joseph Kennedy and Anthony Miles on the day of the shooting. On the night of August 28, 2003, Robert Adams told Taylor to pick up the Suburban from his sister, Andrea Adams. When Taylor went to get the vehicle he was accompanied by Joseph Kennedy, Anthony Miles, and Stewart. As they were leaving Andrea Adams' home, traveling to Cedar Grove on 70th Street near the interstate, they crossed paths with the Caprice that pulled alongside of them. Taylor believed Brokenberry, Francis, and Cawthorn were traveling in the vehicle. Everyone in Taylor's vehicle had previous encounters and troubles with the group in the Caprice. Taylor testified that Anthony Miles stated someone *359 in the Caprice had a gun. Taylor looked over to see the weapon. He testified that the first shot was fired from the Caprice although Stewart and Joseph Kennedy returned fire from the Suburban. Taylor testified that Stewart was shooting a .40 caliber Desert Eagle while Kennedy was shooting a .223 Ruger rifle.
Taylor maneuvered his vehicle behind the Caprice as Stewart and Kennedy continued to fire. The Caprice turned south off 70th Street onto Southern Avenue. Taylor followed until the Caprice crashed. Taylor admitted he followed the vehicle so that they could continue to fire shots at the vehicle. Once the vehicle crashed, Taylor drove from the area returning to Andrea Adams' home on Kelly Key.
Joseph Kennedy, another occupant of the Suburban on the night of the shooting, testified on behalf of the state as to his involvement in the incident. According to Kennedy he sat in the rear passenger seat behind Stewart as they were traveling in the Suburban on 70th Street. Kennedy was first alerted to trouble when he heard "they got a gun," and two or three shots were fired from the blue car. Kennedy recalled that Stewart began shooting his weapon first and then the two backseat passengers began shooting at the vehicle. It was at this point that Kennedy and Stewart returned fire. Kennedy admitted to shooting a .223 Ruger Mini Fourteen rifle and testified that Stewart shot a .40 caliber weapon. Kennedy testified he actually saw Stewart shoot the weapon. Kennedy also testified that Miles shot a weapon.
Richard Beighley, a criminalist with the North Louisiana Crime Lab, was qualified as an expert in firearms analysis and identification. Beighley testified regarding his analysis of the firearms and evidence collected in the case. His evaluation included a Glock handgun, .40 caliber Desert Eagle handgun and a Ruger Mini Fourteen rifle. Beighley concluded that the two .40 caliber casings collected at the scene were fired from the .40 caliber Desert Eagle pistol recovered from the Kelly Key home. Beighley was able to reach this conclusion by retaining test fire from the pistol and comparing them to those found at the scene. He was able to eliminate other weapons as potentially having fired the cartridges.
Utilizing the same methodology with the rifle, Beighley concluded that the sixteen .223 caliber casings recovered from the scene were also fired from the .223 rifle recovered from the Kelly Key home. One bullet jacket collected from the scene could not be matched to any of the weapons recovered in the case.
Beighley could not make an identification of the bullet jacket and lead fragments taken from Myers. He concluded that the bullet jacket had the same class characteristics as the reference bullets fired from the .223 rifle, but the bullet jacket retained insufficient individual markings for positive identification. Beighley testified that he did not find sufficient markings on the damaged bullet jacket to positively eliminate all other weapons as having potentially fired the bullet. Beighley could not, however, eliminate the recovered weapon (.223) as the one that fired the damaged bullet. Beighley agreed that it was possible that the .223 rifle was the weapon that killed the victim.
Andrea Adams was living at 6226 Kelly Key when the shooting incident occurred. She testified for the state. At some time on April 28 before the shooting, five men, including Stewart, came to her house to pick up the Suburban for Adams. Andrea Adams testified she was initially reluctant to give the vehicle to the guys, but after speaking with her brother by telephone, *360 she let them take it. Andrea Adams stated when the group returned the following morning, they were armed and someone brought a chopper (assault rifle) into the house. She could not identify other weapons brought into the house. Later, Robert Adams, his girlfriend and children arrived at the house because Marcus Taylor called to warn him to leave his house because of the confrontation and the possibility of retaliation. Andrea Adams confirmed that police came to her home sometime that morning when she consented to a search of her home. The officers recovered the assault rifle as well as the .40 caliber weapon.
Detective Jody Jones additionally testified that after Stewart was taken into custody, he agreed to give a statement to the detectives. Stewart signed a Miranda[1] rights form prior to being questioned. In his statement to police which was provided to the jury, Stewart admitted to being in the Suburban with the other three men and sitting as the passenger in the front seat. He stated that the men had a .40 caliber and a big gun, but did not admit to possession of the .40 caliber which he claimed was in the console. He stated that the rifle was on the back seat and that "Pookie," referring to Kennedy, shot the rifle. Stewart stated the Miles sat in the back and Marcus Taylor drove. Stewart identified Brokenberry as the driver of the blue car but could not identify any of the other occupants.
Viewed in the light most favorable to the state, this evidence establishes that Stewart was a passenger in the maroon Suburban which was identified by independent witnesses as being involved in the gunfight that occurred in the early morning hours of August 29, 2003. The evidence adequately established a tremendous amount of animosity between the two groups of young men in both vehicles which had previously caused prior violence and gunfire between them. The firearms expert was able to positively link shell casings scattered throughout the two-block crime scene to the weapons that were fired from the vehicle in which Stewart was riding. Stewart's co-defendants testified that Stewart fired a .40 caliber pistol from the Suburban during the altercation.
This evidence establishes beyond a reasonable doubt that Stewart and his companions in the Suburban perpetrated a "drive-by shooting" by their discharge of the weapons from their vehicle with the specific intent to kill or cause harm to the occupants in the Caprice. The evidence showed Stewart to be one of the two shooters in the Suburban. Even in his statement to police, Stewart did not claim that he attempted to resist the actions of his companions in chasing the Caprice along the public street with the intent to harm the occupants of that vehicle by gunfire.
The fact that numerous shots were fired into the rear of the Caprice indicated that it was being chased by the Suburban. This physical evidence supports Taylor's claims that he purposefully maneuvered his vehicle behind the Caprice after the gunfire began with the specific purpose of allowing his friends to fire a barrage of bullets at the occupants of the Caprice. With this evidence of the location of the two vehicles as the Caprice swerved and wrecked moving toward the victim's home, the gunshots from the Suburban would have been shots aimed in a southerly direction toward the home. When the Caprice came to rest after the wreck and the shooting briefly continued, gunfire from the Suburban on Southern Avenue or 72nd Street aimed at the wrecked vehicle would have likewise been aimed directly toward the victim's home. In contrast, the trajectory *361 of any shots from the Caprice toward the Suburban would have been at all times in a northerly direction away from the victim's home.
The evidence of the trajectory of the bullets fired by both vehicles supports the jury's conclusion beyond a reasonable doubt that the bullet that hit the home and killed the victim was fired from the Suburban. Additionally, Stewart's argument that the state was required to prove that his gun killed the victim was addressed by this court in the recent case of State v. Brown, 42,054 (La.App.2d Cir.8/29/07), 965 So.2d 580, writ denied, 07-1939 (La.2/15/08), 976 So.2d 174. In Brown, this court affirmed the second degree murder conviction of a defendant who participated in a drive-by shooting which resulted in the death of two individuals. Evidence showed that the defendant fired shots from the vehicle, but did not link the fatal shots to his gun. This court affirmed the conviction as follows:
Viewed in the light most favorable to the prosecution, the evidence was sufficient for a reasonable trier of fact to conclude that Brown was a principal in a retaliatory, drive-by shooting that resulted in the death of the two victims. The defendant's specific intent to kill or at least inflict great bodily harm may be inferred from his act of pointing a gun and firing into a group of people. It is of no consequence whether defendant, in firing his weapon into a crowd, intended to hit one person or several people. Moreover, Brown clearly and actively participated in an assault by drive-by shooting, leading to two deaths, which satisfies the elements of felony second degree murder, even if specific intent to kill or inflict great bodily harm had been unproven. . . . .
Id. at 586.
The Brown ruling therefore rests on the proposition that a defendant who is a principal in a drive-by shooting can be convicted of second degree felony murder even though the fatal shot was fired by a companion acting in concert with the defendant in the commission of the shooting. Moreover, in this case, even though none of the Suburban co-conspirators in the drive-by shooting intended to harm the victim, our felony murder statute allows for a conviction "even though he has no intent to kill or to inflict great bodily harm." The elements of felony second degree murder having been sufficiently established, Stewart's first assignment of error is without merit.
In a pro se brief, Stewart argues that the state knowingly elicited perjured testimony in order to obtain his conviction, thereby denying his rights to due process and cross-examination. Specifically, Stewart contends that the prosecutor suborned perjury when Taylor and Kennedy testified that they expected nothing in return for their testimony against Jesse Stewart. Also, it is Stewart's position that the co-defendants changed their initial statements and lied at trial in order to obtain reduced sentences.
At the time of trial, Taylor and Kennedy had both pled guilty to manslaughter and were awaiting sentencing. Both had given initial statements that were inconsistent with their testimony at trial. Through both direct and cross examination, the guilty pleas of Taylor and Kennedy and their prior inconsistent statements were presented for the jury's consideration in its determination of their credibility.
There was no evidence that Taylor and Kennedy had received agreed sentences for their pleas. Therefore, even with the impossibility of this record to reflect their ultimate sentences that occurred after trial, *362 nothing supports Stewart's claim that the men received reduced sentences after their testimony.
Finally, the suggestion in Stewart's pro se argument that the assistant district attorney (ADA) admitted that Taylor and Kennedy had received sentencing agreements for reduced sentences in exchange for their testimony is unfounded. To the contrary, the ADA stated in closing that nothing was promised the men for their testimony.
The pro se assignments of error and arguments are therefore without merit.

Conclusion
For the foregoing reasons, we affirm Stewart's conviction and sentence.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).