Judgment rendered December 14, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,597-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

MICHAEL DUCK                                Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 93,301

Honorable Michael Owens Craig, Judge

* * * * *

DMITRC IAN BURNES                           Counsel for Appellant

MICHAEL DUCK                                Pro Se

JOHN SCHUYLER MARVIN                        Counsel for Appellee
District Attorney

HUGO A. HOLLAND, JR.
RICHARD RUSSELL RAY
Assistant District Attorneys

* * * * *

Before MOORE, COX, and HUNTER, JJ.

**HUNTER, J**.

The defendant, Michael Duck, was charged by bill of indictment with the first degree rape of A.O. and the first degree rape of C.O., in violation of La. R.S. 14:42(A)(4). Following a jury trial, the defendant was found guilty as charged of the first degree rape of A.O. and guilty of second degree rape with regard to C.O. The defendant was sentenced to serve life in prison without the benefit of probation, parole, or suspension of sentence for the first degree rape conviction, and 38 years without the benefit of probation, parole, or suspension of sentence for the second degree rape conviction. The sentences were ordered to be served consecutively. For the following reasons, we affirm the defendant's convictions and sentences. We remand this matter to the trial court with instructions to provide the defendant with written notice of the sex offender registration requirements.

## FACTS

The victims in this case are A.O. and C.O., the stepdaughters of the defendant, Michael Duck. In March 2016, the Webster Parish Sheriff's Office ("WPSO") received a report in reference to "a rape of a juvenile" in Sarepta, Louisiana. Deputy Joe Morgan was dispatched to the residence and encountered A.O., an 11-year-old girl, standing outside. Deputy Morgan testified A.O. approached his vehicle and reported the defendant had been engaging in sexual intercourse with her and her younger sister, C.O. According to Deputy Morgan, A.O. informed him the sexual abuse began when she was six years old. After obtaining permission from the children's mother, Deputy Morgan questioned C.O., who was nine years old. C.O. confirmed A.O.'s statements. A.O. and C.O. also reported the defendant's

adult son, Michael Anthony Dragland ("Andy"), had also been engaging in sexual intercourse with them.[1]

Once officers learned A.O. and C.O. had not changed clothes since the last sexual assaults allegedly occurred, Deputy Morgan instructed A.O. and C.O. to place the clothing they were wearing into bags, which he confiscated as evidence. Both children were transported to a local hospital for a physical examination, and they were later interviewed at the Gingerbread House.

C.O. was born in January 2007, and she was 14 years old when she testified at trial. C.O. testified she was two years old when her mother married the defendant, and the defendant began sexually abusing her when she was four or five years old. C.O. testified she lived in the home with the defendant, her mother, A.O., and her brothers, Ch.O. and K.O. She also testified Andy, the defendant's son from a prior marriage, lived in a "camper" on the same property; Andy's wife and children also lived in the camper. C.O. further testified her mother had "a problem with drugs," and she slept "a lot."

C.O. also attested the defendant and Andy engaged in vaginal and oral sexual intercourse with her and A.O. on numerous occasions, and at times, both men had sex with her and A.O. at the same time. C.O. further testified the defendant attempted to insert his penis into her anus on one occasion, but "it wouldn't fit." She stated the sexual abuse did not end until the abuse was reported to law enforcement. C.O. also stated she and her siblings traveled

_____

[1] Michael Anthony Dragland was also charged with two counts of first degree rape. However, those charges are not at issue in this appeal.

2

in a camper with the defendant when he worked out of state, and the sexual abuse also took place in other states, namely Kansas and Ohio.

According to C.O., she and A.O. had been sexually abused by the defendant the night before A.O. reported the abuse to the authorities, and she was abused by Andy on the night the abuse was reported.[2] C.O. testified after she and A.O. reported the abuse, she and her siblings were removed from her mother's custody and were placed in separate foster homes.

During cross-examination, C.O. admitted she told law enforcement officers the defendant performed oral sex on her, but he did not force her to perform oral sex on him. She stated her mother had instructed her to lie to the officers, so her children would be returned to her custody. She also testified the defendant was in the process of adopting her and her siblings when the abuse was reported. C.O. admitted she and A.O. did not want the defendant to adopt them. She stated she and her sister wanted to live with one of her mother's friends, Kristy, because Kristy consistently provided them with food when they did not have any food at home.

On redirect examination, C.O. testified the defendant would ensure he was alone in the house with her and A.O. by sending her mother on errands and sending her brothers outside. She also testified she and A.O. would sometimes refuse to engage in sexual intercourse with the defendant, and he would punish them by beating and starving them, locking them outside,

---

[2] The video recording of C.O.'s Gingerbread House interview was played for the jury. C.O., who was nine years old at the time, told the interviewer the defendant had "raped" her. She also stated the defendant would tell her to lie down, pull her pants down, and "get started." She further stated a part of the defendant's body would go into her body. C.O. did not know the proper names for the male and female genitalia; however, she was able to draw a circle the around the anatomical parts on a picture. Additionally, C.O. stated the defendant would put his mouth on her "private."

refusing to allow them to bathe, or forcing them to bathe outside in cold weather.

Mona Hanson, C.O.'s foster mother, testified C.O. was undergoing psychological counseling to address mental health issues stemming from the abuse. Over the defense's objections, the State introduced into evidence photographs of numerous superficial cuts on C.O.'s arms and legs from engaging in self-harm. Hanson testified following a pretrial meeting with the district attorney's office, C.O. returned home "very quiet and withdrawn," and she "just cried on and off the rest of the afternoon." Hanson stated later that day, she found C.O. "curled up in a ball" with cuts all over her arms and legs. C.O. had also carved the word "die" into her leg. She testified she transported C.O. to the emergency room to have the wounds treated.

A.O. was born in March 2005. She was 16 years old when she testified at trial. A.O. testified she was "four or five" when her mother married the defendant, and she was "about seven" when the sexual abuse began. A.O. specifically testified the defendant inserted his penis into her vagina and mouth, and he placed his mouth on her vagina on numerous occasions. She further testified the defendant and Andy had engaged in sexual intercourse with her. She also stated she called the authorities to report the abuse in 2016 because she knew engaging in sexual intercourse with her stepfather and stepbrother "wasn't how things were supposed to be," and she "just got tired of it."[3]

---

[3] The video recording of A.O.'s Gingerbread House interview was also played in open court. A.O. told the interviewer she was about six or seven years old when the sexual abuse began. She stated the defendant would "get on top of her" and "do it" to her. She also stated the defendant "put his mouth in her private part."

A.O. testified she had been sexually assaulted by Andy "a couple of hours" before she called law enforcement, and by the defendant "maybe a day or two before." She stated whenever she and C.O. refused to engage in sexual relations with him, the defendant would punish them with beatings and starvation, and he would generally treat them "like crap." A.O. was unable to recall how many times the defendant engaged in sexual intercourse with her because it happened "so many times." She corroborated C.O.'s testimony that the sexual abuse occurred in Kansas and Ohio when the family traveled with the defendant for his job. A.O. also testified she had witnessed the defendant engaging in sexual intercourse with C.O. on many occasions, and she had witnessed him having sexual intercourse with G.N.D., one of his daughters from a previous marriage.

During cross-examination, A.O. testified she and C.O. were currently living in separate foster homes and attending different high schools, but they would visit each other at times. A.O. also testified before she reported the abuse, she and C.O. had often visited Kristy, one of her mother's friends; however, she did not tell Kristy about the sexual abuse until the night before she reported it. She stated Kristy gave her a number to call to report the abuse. A.O. admitted before the abuse was reported, she and C.O. wanted to live with Kristy because she took better care of them than their mother. A.O. further testified she had never told her mother about the sexual abuse because she was afraid her mother would not believe her. She also recalled her mother urging her to lie to the police officers.

During redirect examination, A.O. testified her mother did not support her and C.O. after they made the allegations against the defendant. She

stated her mother attempted to convince her to "change her story." A.O. explained she wanted to live with Kristy because she felt safe at her house.

Dr. Lissette Wise, a clinical psychologist, was accepted by the court as an expert in the field of clinical psychology. She testified she had never interviewed the victims in this case. Dr. Wise also testified delayed disclosure is common in children who are victims of sexual abuse. She explained as follows:

> In some cases, the child is being harmed by the people that are supposed to be caring for them and protecting them. So when you're in an environment where the person who's supposed to care for you is the person hurting you, it's not, "I'm now going to report." There has to be so many circumstances available, such as an opportunity to tell, and it has to be maybe a safe person to tell. There has to be potential support to tell. And depending on the age of the child, it may not even quite make sense what's going on. They may not even have the language to talk about what has happened because they're so little. That's not language that they have. There's also shame and embarrassment and fear. You have no idea how many threats have been made. So there's a lot that gets in the way of immediately reporting, and instead it can be months, it can be years, and in some cases, people never disclose until you ask them about it in adulthood. [4]

Dr. Wise also testified children often used terms such as "messed with" or "my pants were pulled down" because they are unable to describe the act(s). She further testified "chronological confusion" is common in children because they do not have a "normal sense of time" and are unable to conceptualize phrases such as "a week ago" or "three months ago." She stated children who are being sexually abused are incapable of focusing on the incidents as "calendar events" because they are "just trying to survive

_____

[4] The record indicates the victims lived a rather isolated existence. They did not have access to many adults outside of their family because they were not enrolled in school. During her Gingerbread House interview, C.O. stated A.O. had once encountered a police officer at a convenience store, and she attempted to report the abuse to him.

6

and get through it." According to Dr. Wise, when details the child provides appear to be "vague" or "sketchy," it is not because the child is being untruthful. She stated the lack of detail may be caused by the child's inability to possess the language and memory, or the inability to specify the timeframe. Dr. Wise further testified it is not uncommon for victims of sexual abuse to experience post-traumatic stress disorder and engage in self-harming activities, such as cutting themselves.

During cross-examination, Dr. Wise testified when acts of sexual abuse have been repeated over a long period of time, the victim may give different versions of specific acts of abuse. When questioned about different accounts provided by A.O. and C.O. on the night the abuse was reported (*i.e.*, C.O. testified she was alone when Andy raped her; A.O. stated she was in the room with C.O. at the time), Dr. Wise explained:

> It does not mean that it was necessarily inaccurate or dishonest. It means that if there had been multiple episodes of sexual assault or abuse, then there can be a confusion in what happened two days ago versus what happened three months ago, but it's still an event that is remembered.

Olivia Jones, a forensic sexual assault nurse examiner ("SANE") employed by the Northwest Louisiana, testified at trial. She stated she did not perform the rape examinations of the victims in this case.[5] According to the medical records, C.O. refused to allow the nurse to examine her. Jones explained that victims are not forced to undergo sexual assault examinations in order to prevent "revictimizing" victims. Jones admitted A.O.'s vaginal examination did not reveal any evidence of penetration. She testified studies

---

[5] The nurse who examined A.O. and prepared the rape kit was killed in an automobile accident prior to the trial in this matter.

have proven that most victims of sexual assault "do not present with injury, or actually any evidence at all." She also stated lack of evidence of penetration does not mean penetration did not take place.

M.K., one of the defendant's adult biological daughters, also testified at trial. M.K. testified she did not begin to establish a relationship with the defendant until she was approximately 15 or 16 years old. She stated she learned of the sexual assault allegations the night A.O. called law enforcement, but she did not believe the allegations at first. M.K. testified the defendant's wife called her and asked whether the defendant had ever "messed with" her. She stated she was not being truthful when she told the defendant's wife, law enforcement officers, and various family members she had never been sexually abused by the defendant because she "wasn't ready to tell [her] story." According to M.K., she now "absolutely" believes A.O. and C.O. are telling the truth about the sexual abuse because she was also a victim of sexual abuse. M.K. testified she voluntarily contacted the WPSO and told Detective Heather Boucher she had been lying, and she "needed to get some things off [her] chest." M.K. testified one night, when she was 17 or 18 years old, the defendant began reading a passage from a book and told her it was "completely normal for a daughter to be attracted sexually to her father." She stated the defendant placed his hand between her legs and touched her through her clothing.

Ch.D., the defendant's cousin, testified the defendant is "much older" than she is, and she grew up in her grandparents' home, which was next door to the defendant's house. At the time of the trial, Ch.D. admitted she was in jail awaiting sentencing for possession of methamphetamines, and she had

8

been struggling with drug addiction for much of her life. Ch.D. also testified when she was 13 years old, the defendant gave her marijuana for the first time. Ch.D. also testified that same night, she, the defendant, and one of his daughters, G.N.D, were in a tent when the defendant positioned his hand underneath her shirt, began rubbing her breasts, and placed his hands inside her pants. She testified the defendant stopped when she began to "freak out," and she did not report the incident to anyone because she was afraid. Ch.D. also stated she had witnessed the defendant "messing with" G.N.D. in the tent. She was unable to recall G.N.D.'s age, but she stated she was 13 years old at the time, and G.N.D. was younger.

During cross-examination, Ch.D. admitted she did not come forward with allegations of molestation until she was contacted by Det. Boucher regarding the defendant's current charges. She testified she was awaiting sentencing on her drug charges, and she had not been offered anything in exchange for her testimony.

Ch.O., the brother of A.O. and C.O., testified he had very recently come forward with allegations of sexual abuse. Ch.O. testified on one occasion, he was between seven and nine years old, the defendant began to "touch all over me, and he was wanting me to suck his d\*\*k." He specifically stated the defendant touched his (Ch.O.'s) penis, and the defendant urged him (Ch.O.) to touch his (the defendant's) penis. According to Ch.O., he began to yell when the defendant told him to suck his penis, and the defendant responded by slapping him in the face, telling him to "shut up," and sending him back inside the house. Ch.O. corroborated C.O.'s testimony that their mother had a "drug problem" and she slept a lot, leaving

9

the defendant "in charge" of the household. He stated the defendant would punish him and his siblings by hitting them with belts, switches, or "whatever he could get his hands on."

On cross-examination, Ch.O. admitted he did not make the allegations of sexual assault until a week before the trial, after he was arrested for carnal knowledge of a juvenile. Ch.O testified he was 18 years old, and his alleged female victim was 14 years old. He also testified he was released from jail because the parents of the alleged victim "dropped the charges" and his grandmother "signed the papers." Ch.O. admitted he had repeatedly told law enforcement officers he did not believe the allegations made by A.O. and C.O. He explained he denied his sisters' allegations because he was too embarrassed and afraid to tell anyone what the defendant had done to him. He also testified the State had not promised him anything, with regard to his pending charges, in exchange for his testimony.

C.D., the defendant's 23-year-old biological daughter, testified at trial. She testified that early in the investigation, she told police officers when she was "eight or nine" years old, she "wound up in bed with" the defendant one night, and her "hand was placed on his penis." However, at trial, C.D. testified her statement to the officers was not true, and she had been coerced into lying by the victims' mother to "help the girls come home faster."

G.N.D., another one of the defendant's biological daughters, also testified. G.N.D., who suffered from an intellectual disability and multiple sclerosis, testified the defendant began engaging in sexual intercourse with her when she was eight years old, and the abuse did not end until she broke all contact with him at the age of 24. She also testified the defendant told

Andy to have sexual intercourse with her when she was 23 years old, and the defendant remained in the room to watch. G.N.D. testified she told her mother about the abuse when she was 15, and nothing was done about it. She stated she continued to engage in sexual intercourse with the defendant until she was 24 years old because she "did not know how to stop it." G.N.D. stated she came forward after A.O. and C.O. reported the allegations, and she felt responsible because she "had plenty of time to stop it before they got hurt." Further, G.N.D. corroborated Ch.D.'s testimony regarding the incident in the tent.

During cross-examination, G.N.D. testified the defendant's wife told her to report her abuse to the sheriff's department. Somehow, the victims' mother believed the information would assist her in regaining custody of her children.

Audra Williams, a DNA analyst at the North Louisiana Crime Lab, was accepted by the court as an expert in DNA analysis. She testified the absence of DNA/sperm in the vagina of a victim of sexual assault does not mean the assault did not occur. Williams also explained some DNA testing can positively identify a particular person, while others can only identify someone in the genetic line, such as a father/son. She also testified the presence of DNA on a victim's genitalia may be removed by activities such as putting on clothing, urinating, or wiping the area.

Williams further testified the partial DNA profile retrieved from A.O.'s external vaginal area revealed the presence of male "contact DNA" from the defendant's parental line, and, in her opinion, the male DNA was more likely than not placed there less than 24 hours prior to the rape kit

examination. Additionally, Williams testified she conducted tests on the clothing C.O. was wearing the night of the examination because C.O. refused to submit to a sexual assault examination that night. Williams testified DNA testing of C.O.'s panties revealed the presence of "mixtures from at least two males." However, she was unable to ascertain the source of the male DNA.

During cross-examination, Williams testified the presence of spermatozoa or prostate specific antigen could not be detected in the testing of A.O.'s vaginal and perineal swabs. She also testified the mixture of male DNA retrieved from C.O.'s panties could have been transferred by underwear rubbing together in the same dirty clothes hamper or washing machine. On redirect examination, Williams testified it is "very common" for sperm to be undetectable in a sexual assault case.[6]

Several witnesses testified for the defense. K.O., the brother of A.O., C.O., and Ch.O., testified. K.O. is the oldest of his mother's biological children, and he was 19 years old at the time of trial. K.O. stated the defendant is not his biological father; however, he refers to him as "dad," and they enjoyed a "good father/son relationship." He testified he and his

---

[6] Other witnesses also testified at trial. Deputy Theresa Rogers, a deputy employed by the WPSO, testified she retrieved the rape kit from the nurse examiner the night A.O. and C.O. were taken to the hospital. Deputy Rogers stated the examination was in progress when she arrived at the hospital, so she waited to obtain the kit from the nurse. She testified she transported the rape kit to the sheriff's office and placed it inside a refrigerator used to store rape kits. She also testified she did not respond to the defendant's residence that night, and she did not interview A.O. and C.O. that night because it was the policy of the sheriff's department to allow the child victims to be interviewed at the Gingerbread House.

Sandra Thomas, a foster care supervisor with the Louisiana Department of Children and Family Services ("DCFS"), testified A.O. and C.O. were still in DCFS custody and had not been returned to their mother's custody.

siblings had lived with the defendant since he was eight or nine years old. He corroborated the testimony that the defendant sometimes took the family with him when he traveled out of state with his job.[7] He described the defendant as the disciplinarian of the family and stated the level of discipline levied depended "on how bad we mess up." K.O. testified the discipline imposed ranged from "whippings" with a belt, to being ordered to sit in a corner. He denied ever being deprived of food as a method of punishment.

Further, K.O. described the defendant's relationship with C.O. and A.O. as "a typical father/daughter relationship," and he had never observed him behaving inappropriately with A.O., C.O., and Ch.O. He also testified A.O. and C.O. never seemed "uncomfortable being around" the defendant or Andy. According to K.O., the night A.O. and C.O. reported the allegations, Andy was playing video games in the living room, and he did not go into the bedroom with A.O. and/or C.O. He testified there was no opportunity for Andy to engage with sexual intercourse with either A.O. or C.O. on the night the allegations were reported.

Det. Heather Boucher was called as a defense witness. She testified the district attorney's office requested that she follow up with some of the witnesses in this case. She stated she interviewed M.K, Ch.D., Ch.O., and M.D., the mother of the victims. Det. Boucher testified she decided to interview Ch.D. because her name had been mentioned as a possible witness. She also stated she was present during Ch.D.'s initial trial

---

[7] K.O. contradicted his siblings' testimony regarding parental neglect. He described his mother as a "good parent." He stated she always cooked meals for the family, and she never left the children without food or nourishment. He admitted his mother sometimes slept during the day, "depend[ing] on how her day went," but she did not do so when the defendant was home. K.O. explained his mother "acted like a completely different woman than she was when [the defendant] was there."

testimony, and she realized Ch.D. had initially stated the defendant had molested C.D., not G.N.D., in the tent. Det. Boucher explained Ch.D. was "extremely upset" during the interview because it was the first time she had disclosed the tent incident to anyone.[8]

C.D. was recalled as a witness for the defense. She stated she did not recall any incident in the tent with Ch.D. and the defendant; she would have been less than one year old at the time that incident allegedly occurred. She also testified she had never discussed any allegations of sexual abuse with Ch.O.[9]

At the conclusion of the evidence, the jury found the defendant guilty as charged of the first degree rape of A.O. With regard to C.O., the jury found the defendant guilty of second degree rape, a responsive verdict to first degree rape. The defendant was sentenced to serve the mandatory sentence of life without the benefit of probation, parole, or suspension of sentence for first degree rape. He was also sentenced to serve 38 years without the benefit of probation, parole, or suspension of sentence for the second degree rape conviction. The sentences were ordered to be served consecutively.

The defendant appeals.

## DISCUSSION

The defendant contends his constitutional right to a fair trial was denied when the trial court "limited" questions defense counsel posed to

---

[8] During Det. Boucher's testimony, Ch.D. was recalled as a witness. She admitted she initially told Det. Boucher she saw the defendant engaging in improper sexual behavior with his daughter, C.D. that night in the tent. However, upon further reflection, Ch.D. recalled it was G.N.D., not C.D, in the tent that night.

[9] Ch.O. testified C.D. told him the defendant had molested her.

C.O. The defendant argues the trial court denied his right to confront and cross-examine witnesses. More specifically, the defendant maintains when his attorney was questioning C.O. about discrepancies between her testimony and her statements to law enforcement officers, the trial court ordered the attorneys to approach the bench and conducted a sidebar before stating, "I mean, his right to confrontation has been well satisfied at this point."

The Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 16 of the Louisiana Constitution guarantee a criminal defendant the meaningful opportunity to present a complete defense. *State v. Dressner*, 08-1366 (La. 7/6/10), 45 So. 3d 127, *cert. denied*, 562 U.S. 1271, 131 S. Ct. 1605, 179 L. Ed. 2d 500 (2011). The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42, 53-54, 124 S. Ct. 1354, 1359, 1365, 158 L. Ed. 2d 177 (2004). The main purpose of confrontation rights is to secure for the defendant the opportunity to cross-examine. Cross-examination is the primary means by which to test the believability and truthfulness of testimony, and it provides an opportunity to impeach or discredit witnesses. *State v. Mitchell*, 16-0834 (La. App. 1 Cir. 9/21/17), 231 So. 3d 710, *writ denied*, 17-1890 (La. 8/31/18), 251 So. 3d 410.

Pursuant to the code of evidence, "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility." La. C.E. art. 611(B). The trial court is empowered to exercise reasonable

control over the manner of cross-examination so as to (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid the needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. La. C.E. art. 611(A). "Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness." *State v. Robinson*, 01-0273 (La. 5/17/02), 817 So. 2d 1131, 1135. The ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court's broad discretion. *State v. Draughn*, 05-1825 (La. 1/17/07), 950 So. 2d 583; *State v. Irish*, 00-2086 (La. 1/15/02), 807 So. 2d 208, *cert. denied,* 537 U.S. 846, 123 S. Ct. 185, 154 L. Ed. 2d 73 (2002).

In the instant case, during the cross-examination of C.O., the following colloquy occurred:

> [DEFENSE COUNSEL]: Okay. And prior to that phone call at ten or eleven at night *** when [A.O.] called [law enforcement], when did Andy Dragland sexually assault both you and [A.O.] at that residence?
>
> [C.O.]: It was that night. [A.O.] went to go to the laundry room to fold clothes and when she left, he turned on his phone and he made me watch a video and he told me that he wanted to do the exact thing that – the exact thing that the video did.
>
> [DEFENSE COUNSEL]: Now where did that happen inside the residence?
>
> [C.O.]: In the living room.
>
> [DEFENSE COUNSEL]: In the living room. Were y'all doing anything in the living room at the time that happened?

16

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: I mean, at the time that this assault happened with Andy Dragland that we're talking about. The night that this phone call was made, your testimony is that your sister, [A.O.], was out in the laundry room, correct?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: Okay. And that your stepbrother, Andy Dragland, was inside the residence with you in the living room; is that right?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: And your testimony is: he turned a, some type of, I'm assuming a pornographic film, on a cell phone and showed it to you?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: Okay. What were y'all doing in the living room before he did that?

[C.O.]: We were sitting down watching TV.

***

[DEFENSE COUNSEL]: Okay. Who else was in the living room with you and Andy Dragland at the time y'all were there together watching [T.V.], and he then turned his phone on and showed you this pornographic film?

[C.O.]: Nobody.

***

[DEFENSE COUNSEL]: Back to the night that this occurred, the night that [A.O.] called the police, sometime after ten o'clock. Do you recall what time that night this sexual assault involving Andy Dragland occurred before the phone call was made at ten o'clock?

[C.O.]: It was a couple of minutes before the cops got there.

[DEFENSE COUNSEL]: I'm sorry. You may have misunderstood my question. Before the call was made, how much time elapsed between when this assault occurred and after ten p.m. when [A.O.] called the police? Was it a couple of minutes? Was it a couple of hours?

[C.O.]: It could have been a couple of minutes.

17

[DEFENSE COUNSEL]: Okay. Now when this assault occurred it involved both you and your sister, [A.O.], did it not? I'm talking about the assault by Andy Dragland, the night the call was made. He sexually assaulted you and your sister that night, correct?

[C.O.]: No, sir. She was the one who called the DCFS.

[DEFENSE COUNSEL]: Okay. So Andy Dragland did not sexually assault you and your sister the night that the call was made.

[C.O.]: He sexually assaulted me, but I don't know if he sexually assaulted my sister.

[DEFENSE COUNSEL]: Okay. So, and this is obviously, this is an occasion, this is a night you would recall fairly well, correct?

[C.O.]: Yes, sir.

\*\*\*

[DEFENSE COUNSEL]: And it's also, as I understand, that you've already told law enforcement it was common for Andy Dragland to do the same thing, to sexually assault you in the presence of your sister and your sister in your presence; is that correct?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: Okay. The night – the night that this assault occurred upon you involving Andy Dragland, the night that the police were called, your testimony is that your sister was not present when that assault occurred, correct?

[C.O.]: Correct.

[DEFENSE COUNSEL]: And where in the house did the assault occur?

[C.O.]: In the living room.

[DEFENSE COUNSEL]: Okay. Didn't happen in your bedroom?

[C.O.]: No, sir.

[DEFENSE COUNSEL]: You're sure about that?

[C.O.]: I'm sure.

18

[DEFENSE COUNSEL]: And you're certain that the night that Andy Dragland assaulted you, your sister, [A.O.], was not present and did not witness anything; is that correct?

[C.O.]: Correct.

[DEFENSE COUNSEL]: Okay. So it was just you and Andy Dragland. [A.O.] was nowhere when that assault occurred, and I'm talking about the assault the night that y'all called the cops.

[C.O.]: [A.O.] was in the laundry room. She was outside in the laundry room. We were in the living room.

[DEFENSE COUNSEL]: Okay. And your testimony is that that was where Andy Dragland sexually assaulted you, correct?

[C.O.]: Yes. Yes, sir.

[DEFENSE COUNSEL]: How did he sexually assault you in the living room in the residence the night, what we're talking about, the night that the police were called *** describe for the jury the sexual assault

[C.O.]: He made me lay on the couch. And we had got done watching the video, he made me lay on the couch and took my pants off and he was rubbing his penis on my –

[DEFENSE COUNSEL]: I'm sorry, I didn't hear that.
                                    ***
[C.O.]: I said he told me to lay on the couch and he rubbed his penis [on] my vagina.

[DEFENSE COUNSEL]: Okay. Did he insert his penis or put his penis inside you?

[C.O.]: He tried to.

[DEFENSE COUNSEL]: Okay. And you're certain that the night this occurred, and this assault occurred upon you by Andy Dragland, Mr. Andy Dragland, Mr. Duck's son, that [A.O.] was in the laundry room doing laundry and you were alone, and this just happened between you and Andy Dragland; that's your testimony?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: You didn't witness, and I want to make sure I understand your testimony, [C.O.], you did not witness Andy Dragland sexually assault your sister, [A.O.] the

night we're talking about, March 21, 2016, when the police were called.

[C.O.]: No, sir.

[DEFENSE COUNSEL]: No, sir. Okay. There's no doubt in your mind about that?

[C.O.]: No, sir.

[DEFENSE COUNSEL]: That's a – that's a no, sir? Okay. So there's no doubt in your mind. You have no doubt that Andy Dragland did not sexually assault your sister, [A.O.] along with you the night the police were called? There's no doubt in your mind about that?

[C.O.]: No sir.

[DEFENSE COUNSEL]: Okay. Do you recall watching the Gingerbread House video that we just watched? *** I'm on page 17 of 24, of this transcript of the video we just watched. Ms. Flippo asked you, who did something that night? And we're talking about the night we're talking about, March 21, 2016. And your answer was, Andy, our brother. *** So what I'm looking at is accurate and correct, correct?

[C.O.]: Yes, sir.
                              ***
[DEFENSE COUNSEL]: Who did something that night? Your answer, Andy, our brother. And then she asked, tell me what happened that night, like how did it all get started. Your answer was, we were sitting on the couch and my brother went to bed. Now who is your brother who went to bed?

[C.O.]: [K.O.]

[DEFENSE COUNSEL]: Okay. We were sitting on the couch *** and then you say, then he just started to do it, to check on clothes. She says, okay. So this happened while y'all were on the couch or somewhere else? You state or respond, it happened on the couch. Then he brung us to our bedroom. *** Were you and your sister both in there at the same time? *** Who did he do something to first? *** So he did it to you first? *** Then he done it to my sister. ***

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: Okay. So your prior testimony that Mr. Dragland, the night this call was made, March 21, 2016, that he sexually assaulted you alone in the living room while

your sister was out doing laundry in the laundry room is not correct, is it?

[C.O.]: My sister was out in the laundry room. She called the cops.

[DEFENSE COUNSEL]: Okay. But what I asked you was, earlier, just five minutes ago, was – were you alone the night this happened when Andy Dragland assaulted you? Your answer was yes, was it not?

[C.O.]: Yes, it was.

[DEFENSE COUNSEL]: Okay. But, yet days after this incident occurred, your statement to this woman, who interviewed you at the Gingerbread House, was that Andy Dragland basically raped you and your sister side-by-side on your bed in your bedroom; isn't that right?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: Now those two acts that you described are very different, one being Andrew – Andy Dragland raped me alone in the living room of the house while [A.O.] was out in the laundry room outside the house. That's one description you've given today under oath. But what happened to you the night in question when the police were called. This description that you give the Gingerbread House and what you described to law enforcement the night they came to your house, was that Andy Dragland raped you and [A.O.] together side-by-side, one of you, then the other, in your bedroom; isn't that correct?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]: Which one of them is correct? Which one of them is true and which one of them is not true?

[C.O.]: How would the cops have come if [A.O.] didn't call them? How would they know?

[DEFENSE COUNSEL]: I'm not saying that, [A.O.], someone didn't call the cops. I know the cops were contacted. I'm asking you about the sexual assault occurred the night the police were called. That's what we're talking about.

[C.O.]: [A.O.] went out to the laundry room to go call the cops.

[DEFENSE COUNSEL]: I'm not asking about her calling the cops.

21

***

[C.O.]:  My sister went out to the laundry room to go call the cops and I stayed inside because he told me to.

[DEFENSE COUNSEL]:  Who told you to?

[C.O.]:  Andy.

[DEFENSE COUNSEL]:  Okay.  Now you just testified that Andy raped you alone in the living room the night this happened, correct?

[C.O.]:  Yes, sir.

[DEFENSE COUNSEL]:  Okay.  And then the night that it supposedly happened in 2016, you told law enforcement that Andy raped you and [A.O.] together at the same time in front of one another on the bed in your bedroom; isn't that correct?  Isn't that correct?  Isn't that what you told law enforcement?  Isn't that what you described this video we just watched?

[C.O.]: Yes, sir.

[DEFENSE COUNSEL]:  Okay.  Now those are two very different stories; are they not?

[C.O.]:  Yes, sir.

[DEFENSE COUNSEL]:  What's your explanation for why today, under oath, you testified that Andy Dragland raped you alone with [A.O.] nowhere around, [A.O.] didn't see it, and she's out in the laundry room.  And the time this call was made to the police you described that Andy Dragland raped you and your sister together at the same time in the presence of one another on the same bed in the same room; how do you explain that?  You don't have to explain it.  I'm going to go on to another question.  How long had you and [A.O.]., your sister, at the time this phone call was made to the sheriff's office in 2016, how long had you and [A.O.] been talking about getting out of the house where you were living with your mom, [M.D.] and your stepdad, Mike, and your brothers and going to live with Kristy[?]

THE COURT:  [Defense Counse], can y'all approach just a minute?

(SIDE BAR)

 [DEFENSE COUNSEL]:  Oh, I lost track of time.  I'm sorry.

22

THE COURT: It's not – it's not an issue of time. I'm trying to keep them from hearing. I don't know – we need to make sure we get it on the record what's the problem. All right. It's not an issue of time that I'm worried about it. It's not an issue of time that I'm worried about it. I'm not going to stop in the middle of this witness. I mean, what happens, happens. The problem is I'm all for Mr. Duck's right of confrontation. You've asked this question – now you may not remember the answer she gave, and you might be trying to make a point by asking her two and three and four times, but at this point, I'm going to start stopping you for repetitive questions.

[DEFENSE COUNSEL]: Okay.

THE COURT: I know it's a strategy. I know it's a deal of trying to trip her up or change or whatever, but you've asked it, she's answered –

[DEFENSE COUNSEL]: Okay.

THE COURT: -- this question. You've asked about those incidents; she's answered it multiple times. So when I start hearing a repetitive question, I'm going to stop you.

[DEFENSE COUNSEL]: Okay.

THE COURT: I mean, his right to confrontation has been well satisfied at this point.

[DEFENSE COUNSEL]: Okay.

THE COURT: So for now on repetitive answers, I'm going to stop you.

[DEFENSE COUNSEL]: Okay.

THE COURT: All right.

(SIDEBAR ENDS)
***

We have reviewed this record in its entirety. Our review of the record shows no abuse of the trial court's broad discretion in this instance. The defense repeatedly underscored C.O.'s prior statement: Andy had raped her and A.O. the night the abuse was reported; however, at trial, she testified she was alone with Andy when he raped her that night. Consequently, we find

23

no abuse of the trial court's discretion in instructing defense counsel to refrain from continuing to ask repetitive questions during his cross-examination of C.O. The questions pertaining to the events of the night law enforcement was called had been asked and answered multiple times, and defense counsel had strenuously pointed out the inconsistencies between C.O.'s statement to police officers and her testimony at trial. C.O.'s credibility was attacked, and her differing responses had been emphasized in the presence of the jury. There is no indication of what further information the defense could have gleaned from C.O., or how the defendant was prejudiced by the trial court's statements. The trial judge was actively engaged in ensuring the interrogation was effective as a mode of ascertaining the truth and in protecting the 14-year-old victim from harassment or undue embarrassment. This assignment lacks merit.

The defendant also contends the State improperly characterized the questions defense counsel posed to C.O. as "abuse." The defendant argues the assistant district attorney's use of the word, abuse, was prejudicial and unprofessional, and the comment "tainted" the jury's perception of defense counsel's performance. Therefore, according to the defendant, such "improper labeling" of defense counsel's actions should result in this Court overturning his convictions and vacating his sentences.

The record demonstrates the following exchange took place during the State's redirect examination of C.O.:

> [ASSISTANT D.A.]: So, [C.O.], do you realize that the questions that he's asking you and the amount of time you've been sitting up here taking abuse by those questions is about three times as long as your Gingerbread House interview was five years ago; did you realize that?

[C.O.]: Yes, sir.

We note the defendant has raised this issue for the first time on appeal.[10] The defendant did not contemporaneously object to the comment with regard to "abuse," he did not request an admonishment, and he did not move for a mistrial. Although the prosecutor's comment may have been unwarranted and unnecessary, there is no showing the comment was so prejudicial to the defendant as to infringe upon his right to a fair trial. This assignment lacks merit.

The defendant further contends the trial court committed reversible error by allowing the State to introduce into evidence photographs and testimony with regard to C.O. engaging in self-harm (cutting). The defendant argues C.O.'s actions occurred nearly five years after the alleged incidents of sexual abuse, and the testimony and photographs were irrelevant and had no probative value. The defendant maintains the photographs were "extremely emotional," and C.O.'s acts of self-mutilation were unrelated to the charged offenses. Therefore, the photographs should have been deemed inadmissible, and Hanson and Dr. Wise should not have been allowed to testify about C.O.'s acts of cutting.

---

[10] Review of criminal trial errors on appeal has long been governed by the contemporaneous objection rule found in La. C. Cr. P. art. 841. *State v. Cummings*, 46,038 (La. App. 2 Cir. 1/26/11), 57 So. 3d 499, *writ denied*, 11-0341 (La. 6/17/11), 63 So. 3d 1037; *State v. Thomas*, 27,507 (La. App. 2 Cir. 12/6/95), 665 So. 2d 629, *writ denied*, 96-0119 (La. 4/8/96), 671 So. 2d 333. The contemporaneous objection rule serves two related purposes. The first prevents a defendant from withholding an objection or alternative theory of defense to urge for the first time on appeal in the event of a conviction. In fairness, a defendant cannot simply watch the proceedings unfold and silently hope the trial court will commit error. Nor can a defendant adopt, as a matter of strategy, one approach at trial, and then, if that approach fails, argue a contrary or novel view on appeal. The second purpose is the promotion of judicial efficiency. *State v. Cummings*, *supra*.

25

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C. E. art. 403. Questions of relevancy and admissibility are within the discretion of the trial judge, and determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. *State v. Bradley*, 53,550 (La. App. 2 Cir. 11/18/20), 307 So. 3d 369.

In this case, the defendant attacked the charges against him by arguing A.O. and C.O. concocted false allegations of sexual abuse. In an effort to combat the defendant's argument, the State introduced the photographs to show C.O.'s level of anxiety after a meeting regarding the impending trial.

We find the evidence with regard to C.O.'s self-harm was relevant to demonstrate her state of mind after meeting with prosecutors concerning her sexual abuse. The photographs depicted numerous superficial cuts to C.O.'s arms and legs, and were not so gruesome as to prejudice or mislead the jury. Therefore, the relevance of the photographs was not substantially outweighed by any prejudice, confusion, or misleading of the jury. Accordingly, we find the trial court did not abuse its discretion in admitting the photographs into evidence.

The defendant also asserts the trial court erred in rejecting his request for a special jury instruction regarding the number of votes sufficient for a "not guilty" verdict. The proposed instruction stated as follows:

> All twelve of your number must concur in order to reach a verdict of guilty in this case. However, only ten of you must concur to reach a verdict of not guilty or to acquit the defendant in this case. In reaching your verdict, each of you should vote your own honest and considered conviction as to the guilt or innocence of the defendant based upon the evidence and the law.

In support of the proposed jury instruction, the defendant argued in *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020), the Supreme Court held the Sixth Amendment right to a jury trial requires a unanimous verdict to *convict* a defendant of a serious offense. The defendant maintained the *Ramos* decision did not require a unanimous verdict to *acquit* a defendant, and "no law, legislation, or jurisprudence, including *Ramos*, has abrogated the ten (10) to two (2) non-unanimous jury verdict to acquit." He urged, "[T]he spirit of the law requiring unanimous jury verdicts applies to convictions *only*." (Emphasis in original).

The trial court denied the defendant's request for the special jury instruction, stating:

> All right. And I would think that the reason why there's no jurisprudence because there was no significant concern that it would be applied the other way. And if you go back to prior [to] *Ramos*, when you had a six-person jury, you had to have a unanimous jury to convict, you couldn't have a five number to acquit and a six to convict. The Constitutional change that came out of the *Ramos* decision says that you have to have a unanimous jury determination to reach a verdict. And so [I] think all of that is – is control – persuasive in that I'm going to deny your jury instruction in that I don't think that *Ramos* even contemplated the argument that you're making, because that it just was assumed to be if you needed twelve for one way, you had to have twelve the other way, just like in the original or the old law and when it pertained to a six-person jury.

27

The trial court is required to charge the jury "as to the law applicable to the case." La. C. Cr. P. art. 802. The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. La. C. Cr. P. article 807.

Any such charge must be supported by the evidence; however, the trial judge is not required to instruct the jury on abstract principles of law. *State v. Toomer*, 395 So. 2d 1320 (La. 1981); *State v. Gipson*, 28,113 (La. App. 2 Cir. 6/26/96), 677 So. 2d 544, *writ denied*, 96-2303 (La. 1/31/97), 687 So. 2d 402. Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Marse*, 365 So. 2d 1319 (La. 1978); *State v. Gage*, 42,279 (La. App. 2 Cir. 8/29/07), 965 So. 2d 592, *writ denied*, 07-1910 (La. 2/22/08), 976 So. 2d 1283.

In the instant case, the trial court instructed the jury as follows:

> The defendant is presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt. The defendant is not required to prove that he is innocent. Thus, the defendant begins the trial with a clean slate. The burden is upon the State to prove that the defendant's guilt[y] beyond a reasonable doubt. In considering the evidence, you must give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty.

28

***

All twelve of your number must concur in order to render a verdict in this case.

***

In *State v. Gasser*, 22-00064 (La. 6/1/22), 346 So. 3d 249, the

Louisiana Supreme Court stated:

> We likewise find it necessary to address the issue of whether a nonunanimous verdict is required for an acquittal post-*Ramos*. First, *Ramos* only addressed the constitutionality of non-unanimous verdicts to convict and made no findings with respect to acquittals. *** Whether a unanimous jury is required for an acquittal has no impact on the issue in this case. *** [W]e express no opinion on this issue at this time, even if unanimity is now required for an acquittal, this rule cannot invalidate a lawful acquittal, even if one implied by the conviction of a lesser included offense. Again, an acquittal is unassailable. The issue of unanimity in a jury's acquittal is simply not before the Court in this case and we decline to issue any prospective advisory opinion on this issue.

*Id.* at 265.

We find no error in the trial court's refusal to give the requested jury charge. The requested charge does not represent a wholly correct reflection of current law. To date, there has been neither statutory nor jurisprudential justification for the proposed jury charge pertaining to the number of votes necessary for an acquittal. As such, an instruction to the jury would not have been appropriate. Further, the defendant was found guilty of both offenses by a unanimous jury, and there is no showing he was prejudiced by the trial court's failure to give the requested jury instruction. We find the instructions provided to the jury in this case adequately summarized the law with regard to the requirement for unanimity for a conviction. This assignment lacks merit.

Additionally, the defendant contends the trial court committed reversible error in providing the jury with improper responsive verdicts to

29

the offense of first degree rape. He argues La. C. Cr. P. art. 814 requires responsive verdicts to be rendered exactly as listed in the article, without any alterations or deviations. Consequently, the defendant maintains his conviction should be overturned due to the "illegal and unauthorized responsive verdicts" provided by the trial court.

After the conclusion of closing statements, the trial court provided the jury with the following instructions:

> [A]s to the charge of First Degree Rape *** the following verdicts may be returned:
> 1. Guilty.
> 2. Guilty of Attempted First Degree Rape
> 3. Guilty of Second Degree Rape
> 4. Guilty of Attempted Second Degree Rape
> 5. Guilty of Third Degree Rape
> 6. Guilty of Attempted Third Degree Rape
> 7. Guilty of Sexual Battery
> 8. Guilty of Molestation of a Juvenile Under Thirteen
> 9. Guilty of Attempted Molestation of a Juvenile *Under Thirteen*
> 10. Guilty of Indecent Behavior with a Juvenile *Under Thirteen*
> 11. Guilty of Attempted Indecent Behavior with a Juvenile Under Thirteen
> 12. Not Guilty.
> ***

(Emphasis added).

At the time of the defendant's trial, La. C. Cr. P. art. 814(A)(12) provided, in pertinent part:

> The only responsive verdicts which may be rendered when the indictment charges the following offenses are:
> ***
> First degree rape (formerly titled aggravated rape) of a child under the age of thirteen:
>
> Guilty.
> Guilty of attempted first degree rape.
> Guilty of second degree rape.
> Guilty of attempted second degree rape.
> Guilty of third degree rape.
> Guilty of attempted third degree rape.

30

Guilty of sexual battery.
Guilty of attempted sexual battery of a child under the age of thirteen.
Guilty of sexual battery.
Guilty of attempted sexual battery.
Guilty of molestation of a juvenile or *a person with a physical or mental disability.*
Guilty of attempted molestation of a juvenile or *a person with a physical or mental disability*.
Guilty of indecent behavior with a juvenile.
Guilty of attempted indecent behavior with a juvenile.
Not guilty.

\*\*\*

(Emphasis added). The only responsive verdicts, for crimes listed in the article, which may be charged or rendered are enumerated in La. C. Cr. P. art. 814. A trial court is without the authority to add to the listed responsive verdicts under Article 814. *State v. Tucker*, 49,950 (La. App. 2 Cir. 7/8/15), 170 So. 3d 394, *writ not cons.*, 15-1517 (La. 3/9/18), 237 So. 3d 1193; *State v. Williams*, 26,716 (La. App. 2 Cir. 5/10/95), 658 So. 2d 703.

During a discussion with attorneys regarding responsive verdicts, the trial court stated:

All right. On the jury instructions under the responsive verdicts, under the treatises that set forth the appropriate responsive verdicts, the responsive verdicts under guilty of molestation of a juvenile and guilty of indecent behavior of a juvenile and the appropriate attempts that go with those two, there was no reference on the responsive verdicts as to guilty of molestation of a juvenile under thirteen, or guilty of indecent behavior with a juvenile under thirteen. Since in this particular case there is no timeframe where the alleged incidents occurred where either of the victims were over the age of thirteen, it could potentially lead to jury confusion as to the responsive verdicts if they did not have the responsive verdict to be matching with the original charge of first-degree rape which is the element of the child being under the age of thirteen. So with that, and any case law or jurisprudence that is – was silent as to whether or not that was a requirement, the Court made the decision that it is the most appropriate list of responsive verdicts to include molestation of a juvenile under the age of thirteen, and indecent behavior with a juvenile under the age of

thirteen as well as their appropriate attempt responsive verdicts so as not to create additional jury confusion

\*\*\*

We note the defendant did not contemporaneously object to the responsive verdicts as listed by the trial court.[11] However, in the interest of justice, we will address the defendant's argument.

Our review of the statutes and relevant jurisprudence reveals the trial court in this case adequately instructed the jury with regard to the proper definitions of molestation of a juvenile and indecent behavior with juveniles. There have been circumstances under which courts have vacated a defendant's conviction due to the inclusion of improper responsive verdicts. See, *State v. Johnson*, 01-0006 (La. 5/31/02), 823 So. 2d 917 (it is not harmless error when the trial court fails to provide the jury with a list of responsive verdicts/lesser included offenses); *State v. Brown*, 21-01336 (La. 9/29/22), 345 So. 3d 988 (verdict of guilty of a non-crime that was not responsive to the charged offense does not require a contemporaneous objection and constitutes grounds for reversal); and *State v. Porter*, 93-1106 (La. 7/5/94), 639 So. 2d 1137 (deleting statutorily authorized responsive verdicts constitutes reversible error).

However, the aforementioned cases demonstrate circumstances in which the trial court either: (1) wholly failed to provide the jury with a list of responsive verdicts and/or lesser included offenses; (2) provided the jury with responsive verdicts which included a non-crime; and/or (3) deleted

---

[11] The failure to object to the improper jury charge regarding responsive verdicts results in a waiver of the error on appeal. La. C. Cr. P. arts. 801, 841; *State v. Smith*, 41,048 (La. App. 2 Cir. 6/30/06), 935 So. 2d 797; *State v. Houston,* 40,642 (La. App. 2 Cir. 3/10/06), 925 So. 2d 690, *writ denied*, 06-0796 (La. 10/13/06), 939 So. 2d 373.

certain statutorily authorized responsive verdicts from the proposed verdict list.

In this case, the trial court included the full list of responsive verdicts for first degree rape, including molestation of a juvenile, attempted molestation of a juvenile, and indecent behavior with a juvenile. The court merely deleted the phrase "a person with a physical or mental disability" to the offenses of molestation and attempted molestation of a juvenile. The deletion of the phrase is inconsequential in this case because the record does not indicate either of the victims had a physical or mental disability. The court also added "under thirteen" to the offenses of molestation of a juvenile, attempted molestation of a juvenile, and indecent behavior with a juvenile. The defendant was charged with first degree rape of two victims who were under the age of 13, and the evidence demonstrated both victims were under that age of 13 when the offenses were committed. Consequently, we find the trial court did not commit reversible error in deleting the phrase, "with a physical or mental disability," and including the phrase, "under thirteen" to the aforementioned responsive verdicts. Further, the defendant was not found guilty of any of the alleged improper responsive verdicts, and the guilty verdicts rendered in this case were unattributable to any alleged errors pertaining to responsive verdicts. This assignment lacks merit.

In his pro se appellate brief, the defendant raised claims of "harassment" of witnesses by the district attorney's office. More specifically, the defendant contends the district attorney's office "threatened to take my daughter's newborn baby and lock her up for 20 years" for perjury "if she didn't tell the court that I molested her." The defendant

33

further asserts the district attorney's office "harassed other witnesses" and "let witnesses out of jail after their testimony against me."

The record reveals during her cross-examination, the defendant's daughter, C.D., testified she was told during a pretrial meeting at the district attorney's office if she committed perjury, she "would be convicted of felony perjury and would be put in jail for up to twenty years." She further stated no one threatened her with losing custody of her two-week-old baby. However, she testified someone asked her whether her fiancé "had a good enough job to pay for a nanny to help raise [her] son since [she] wouldn't be around to." During her testimony on redirect examination, C.D. stated she was told she could be charged with perjury because the assistant district attorney "thought [she] was lying," and she was aware it is a crime to lie under oath.

"It is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely." *State v. Rubens*, 10-1114 (La. App. 4 Cir. 11/30/11), 83 So. 3d 30, *writ denied*, 12-0374 (La. 5/25/12), 90 So. 3d 410, and *writ denied*, 12-0399 (La. 10/12/12), 99 So. 3d 37, quoting *United States v. Blackwell* 694 F.2d 1325, 1334 (D.C. Cir. 1982). However, warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify. *Id.*

In this case, C.D. was called as a witness for the prosecution. In the years between the defendant's arrest and the trial, C.D. had never recanted her statements regarding being molested by father. However, in the days leading up to the trial, C.D. retracted her statement and denied the

34

molestation occurred. Because the statements provided by C.D. were woefully inconsistent, the district attorney's office properly provided C.D. with information concerning the penalty for perjury. Because C.D. did, in fact, testify her father never molested her, it is clear the warning concerning the dangers of perjury did not "threaten and intimidate [her] into refusing to testify." This assignment lacks merit.

The defendant also asserts the district attorney's office "harassed other witnesses as well." However, the defendant did not provide any specific instances of harassment of other witnesses, and the record is devoid of any evidence to substantiate the claim. Therefore, we decline to address the argument.

The defendant also contends he was denied a fair trial because the district attorney's office "conjure[d] up witnesses from a jail [c]ell" to testify against him. According to the defendant, the district attorney "let witnesses out of jail after their testimony against me."

The constitutional requirement of due process mandates that defendants have a right to a fair trial. *State v. Santos*, 53,596 (La. App. 2 Cir. 3/3/21), 314 So. 3d 1071, *writ denied*, 21-00554 (La. 6/22/21), 318 So. 3d 705. In *Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), the United States Supreme Court extended the rule set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) to cases in which evidence adversely affecting the credibility of government witnesses is withheld from the defense. In *Giglio*, *supra*, an assistant prosecutor promised a government witness he would not be prosecuted if he testified. The promise was not disclosed to the defendant. The Court

reversed the denial of a defense motion for a new trial and remanded for a new trial based on the undisclosed promise made by the prosecutor.

In *State v. Bailey*, 367 So. 2d 368 (La. 1979), a witness for the State was arrested on a felony charge the night before the defendant's trial. An assistant district attorney intervened and procured the witness's release from jail without bail so he could testify against the defendant. The State did not promise or indicate the possibility the charges would be dropped if the witness testified. Nevertheless, the Supreme Court held the prosecutor should have disclosed the witness's arrest and release to the defendant. The Court concluded the witness's release without bond created the inference that he received the impression that his testimony would result in the State dropping the charges against him, and had the information been disclosed to the defense, he could have possibly negated the credibility of the witness.

In *State v. Lindsey*, 621 So. 2d 618 (La. App. 2 Cir.), *writ denied*, 629 So. 2d 417 (La. 1993), the prosecutor promised a codefendant favorable consideration during the plea-bargaining process if she testified and if her testimony was deemed credible. The discussion also included the possibility of the witness receiving a sentence which would result in her release a short time after she entered a plea. The discussion was not disclosed to the defendant, and the prosecutor stated to the jury he had not promised the witness anything in exchange for her testimony. This Court reversed the conviction and remanded for a new trial, stating:

> Evidence of any understanding between [the witness] and the state as to her future prosecution would be relevant to her credibility. *Giglio*, *supra*. We are convinced that had the jury known that [the witness] and the state entered into a deal before the trial was over and immediately after she gave testimony, emphatically denying she expected any favorable consideration,

36

> the jury might have more seriously questioned [the witness's] credibility.  We specifically conclude from this record that there is a reasonable likelihood that the verdict would have been different had the jury been aware of [the witness's] expectation of favorable consideration and of the actual plea agreement entered after she testified but still during trial.  The prosecutor's failure to disclose this information deprived [the defendant] of the opportunity for a fair trial.
>
> ***

*Id*. at 628.

In the instant case, the State called Ch.O. to testify.  Ch.O. admitted he had been arrested the night before he was scheduled to testify at the defendant's trial, and the assistant district attorney was responsible for him being released from detention.  However, Ch.O. testified the State had not promised him anything in exchange for his testimony.

Additionally, Ch.D. was incarcerated and awaiting sentencing on a drug offense when she testified at trial.  She testified she was not promised any advantage in exchange for her testimony.

After carefully reviewing the record, we find the record does not reveal any *Brady/Giglio* violation, as no evidence regarding the credibility of a witness for the State was withheld from the defendant.  The record reveals the defense was aware of the arrests of Ch.O and Ch.D.  Both witnesses testified the State did not offer them any advantage or plea deal in exchange for their testimony against the defendant, and there is no evidence to the contrary.  Ch.O. and Ch.D. were also cross-examined by defense counsel, who skillfully raised the issue of their credibility.  The record contains no support for the defendant's bald assertion that the State "let witnesses out of jail" in exchange for their testimony.  This assignment lacks merit.

37

The defendant also asserts claims of ineffective assistance of counsel with regard to his trial counsel. The defendant's specific claims of ineffective assistance are as follows: (1) counsel failed to present evidence the defendant provided, including letters in which the victims denied "anything even happened"; (2) counsel allowed the defendant's family members to "interview witnesses instead of him or his staff doing it themselves"; (3) counsel "knew before deliberation was over that there [were] two holdouts"; (4) counsel allowed witnesses he had not interviewed to testify; and (5) counsel told the defendant "he was going to hire expert witnesses and shut his office down a week before trial to prep for [the] case, and charged an extra $20,000 for these things that never happened[.]"

A claim of ineffective assistance of counsel is analyzed under the two-prong test developed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. *Strickland, supra; State v. Hilliard*, 52,652 (La. App. 2 Cir. 8/14/19), 278 So. 3d 1065, *writ denied*, 19-01701 (La. 7/24/20), 299 So. 3d 68; *State v. Moore*, 48,769 (La. App. 2 Cir. 2/26/14), 134 So. 3d 1265, *writ denied*, 14-0559 (La. 10/24/14), 151 So. 3d 598. The assessment of an attorney's performance requires his conduct to be

38

evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Hilliard*, *supra*; *State v. Bell*, 51,312 (La. App. 2 Cir. 5/17/17), 222 So. 3d 79.

Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, *i.e.*, a trial whose result is reliable. *Strickland*, *supra*; *State v. Hilliard*, *supra*; *State v. Moore*, *supra*. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show that the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. *Id.*

Generally, a claim of ineffective assistance of counsel is properly raised in an application for post-conviction relief ("PCR") in the trial court. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. *State v. Hilliard*, *supra*; *State v. Mansfield*, 50,426 (La. App. 2 Cir. 2/24/16), 190 So. 3d 322. However, when the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. *State v. Critton*, 52,058 (La. App. 2 Cir. 8/22/18), 251 So. 3d 1281, *writ denied*, 18-1515 (La. 2/25/19), 266 So. 3d 292.

The record on appeal is insufficient to dispose of the defendant's claim of the ineffective assistance of his trial counsel. The specific claims urged by the defendant are not a part of the record, and an evidentiary

hearing would be necessary to ascertain the merits of the defendant's claims. Based upon this record, the defendant's claim of ineffective assistance would more properly be raised in an application for post-conviction relief. Thus, we decline to address the issue at this time.

## ERRORS PATENT

In conducting our review for errors patent in accordance with La. C. Cr. P. art. 920, we note the trial court failed to inform defendant of the sex offender notification and registration requirements, as mandated by La. R.S. 15:543. Defendant's convictions for first degree rape and second degree rape, are "sex offenses" (as defined by La. R.S. 15:541), which require the defendant be subjected to the sex offender notification and registration requirements. La. R.S. 15:542. Pursuant to R.S. 15:543, the trial court is required, using the form contained in La. R.S. 15:543.1, to notify a defendant convicted of a sex offense in writing of the registration and notification requirements. The statute further requires an entry be made in the court minutes stating the written notification was provided.

Here, a review of the record and minutes reveals the trial court did not inform, either orally or in writing, defendant of the sex offender notification and registration requirements. As a result, remand is required with instructions to the trial court to provide the appropriate written notice to defendant of the sex offender registration requirements and to make an entry in the court minutes stating such notice was provided. La. R.S. 15:543; *State v. Griffin*, 51,506 (La. App. 2 Cir. 9/1/17), 243 So. 3d 1205, *writ denied*, 17-0141 (La. 5/18/18), 242 So. 3d 1226; *State v. Moody*, 50,955 (La. App. 2 Cir. 11/16/16), 209 So. 3d 264, *writ denied*, 17-0298 (La. 11/13/17).

**CONCLUSION**

For the reasons set forth herein, defendant's convictions and sentences are hereby affirmed. This matter is remanded to the trial court with instructions to correct the minutes and to provide defendant with written notice of the requirement that he register as a sex offender.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.**